## JONES AND ANOTHER v. GARZA AND OTHERS.

The issue of a subsequent grant, after the usual reference and report that the land was vacant, did not have the effect of a denouncement and adjudication on the previous grant.

We do not wish to be considered as ruling that an adjudication to set aside a previous grant, in all cases, is necessary. In some it may not be; as has been held by this Court. (See Holliman v. Peebles, 1 Tex. R.)

See this case as to the presumption in favor of the authority of officers of the former governments.

See this case for circumstances under which it was held that parol testimony was admissible, to prove the want of authority on the part of the Political Chiefs to issue titles to lands, or make confirmations.

The presumption in favor of the power of the officers of a former government, will not extend so far as to sustain their acts, where they are, if valid, exceptions to the general law and practice.

The Political Chiefs of the Department of Texas had no authority, previous to the Colonization Law of 1825, to grant or confirm land titles; and all titles, issued by them, and not confirmed under the subsequent Colonization Laws, are null and void.

Where a witness was called to prove that he was the person whose name appeared as one of the assisting witnesses, to the original grant, and that he did not sign his name, as assisting witness, and that he could not write his name; *Held*, That the testimony was improperly rejected.

Appeal from Bexar. Suit by appellants to recover from the appellees four leagues of land, fronting on the Guadalupe river, comprehending the Comal spring, and the town of New Braunfels. The plaintiffs claimed title by virtue of a Spanish concession, issued in favor of the Baron de Bastrop, in December, A. D., 1807, by Cordero, Colonel commanding at the Post of Bexar, and also acting as Civil and Political Governor of Texas. In this concession, the party was referred to the Intendant at San Louis Potosi for a confirmation of it. On the 8th of June, 1824, the Baron de Bastrop presented his concession to Sancedo, at Bexar, who, under the style of Primero Vocal of the Illustrious Deputation of Texas, and, *ad interim*, Political Chief, confirmed the same; had the land

Jones v. Garza.

surveyed, and caused the party to be placed in formal possession. The defendants claimed by virtue of a subsequent grant to Veremendi. After the institution of the suit, the plaintiffs located the land, with land certificates; and set up their locations, by way of amendment. On the trial the locations, when offered in evidence, were excluded; and the plaintiffs excepted. But this point was not urged in this Court, the appellants suggesting that they intended to bring a new suit on their locations, if the judgment in this case should be affirmed; and it is therefore, probably, the Court takes no notice of the point, in the opinion. (But notwithstanding the case of Bradford v. Hamilton, 7 Tex. R. 55, it would appear from the cases of Henderson v. Kissam, 8 Tex. R. 46; Bell v. McDonald, 9 Tex. R. 378, and Williams v. Randon, 10 Tex. R. 74, that the locations might have been set up, subject to costs and the statute of limitations, thereby rendering a decision as to the validity of the Veremendi grant necessary. REP.)

There was no proof that the land was denounced as vacant land, and the grant to the Baron de Bastrop adjudicated to present no obstacle to the grant to Veremendi; but there was the usual reference and report that the land was vacant, as if made in ignorance of the former grant.

The jury not being able to agree on a verdict, a verdict was taken *pro forma* for the defendants, by consent.

*A. H. Phillips*, for appellants. Previous to 1754, the King reserved to himself the final confirmation of all titles made by his provincial officers. By royal order of that year, (2 White, 62, 63,) the Viceroys and Presidents of the Royal Audiences were continued in their authority to appoint subdelegates to sell and compromise for lands, who were authorized by same order, to subdelegate their commissions to others, for the distant parts and provinces of their stations, as was previously done. The twelfth Article of same decree, gave the Governor of a distant province, where "sea intervenes" the same power of hearing appeals, &c., and of making confirmations,

as was provided in respect to the Audiences. (Id. 66.) By reference to the 10th Article of same decree, it will be seen that the title was prepared when the original proceedings of petition, survey, &c., were had. The title was then submitted to the confirming power, for review; and if no objection was made, it was issued by the appointee or subdelegate, without any words of approval or confirmation, expressed on its face. (Id. 65.) In 1768, the confirming power was vested in the Intendants. (United States v. Clark, 8 Pet. R. 452.) There is no evidence of any other change; and the presumption is that the practice remained the same in other respects. In 1774, the power of granting lands was revested in Civil and Military Governors. (Ib.) From that time up to 1812, there was no law, order or decree, as to the authority of the Civil and Military Governors, over the public domain, except the law of 1798, referring exclusively to West Florida and Louisiana. Such was the law at the time of the separation of Mexico from the mother country. They show that the concession by Cordero, " Civil and Military Governor of Coahuila and, *ad interim*, of Texas," in 1807, to the Baron de Bastrop was not an act of " usurpation." The same general system was continued; but the Revolution occupied the attention and time of all men of any distinction, and among them the Baron de Bastrop. While the military forces of the country were engaged with those of the King, the Indians devastated the frontier settlements. As soon as tranquility was restored the Baron de Bastrop presented his claim to " the highest officer" in the province, for final consummation. That the officer to whom he applied was the proper officer, on the 8th of June, 1824, we will now, in continuation proceed to show.

The office of Political Chief is defined in the Constitution of 1812, Article 324, " The political government of each province, shall reside in a superior Chief, nominated by the King." (Tribunal del Regno, 124.) See Collection of Decrees, Vol. 5, p. 95; Article 19, Instruction of June 23rd, 1813, Cap.

3rd. " The Political Chiefs, as the first agents of the govern-
" ment, in the provinces, shall have power to exercise, in their
" said provinces, the authority which paragraph 11 of Article
" 172 of the Constitution concedes to the King; but only in
" the case which is there provided." (Collection of Decrees,
Vol. 5, p. 99.)   If there was any material law relative to
the Political Chiefs " beyond seas," prior to the 5th October,
1821, it has not fallen under my observation.

But it may be urged that by Political Chiefs, here alluded
to, Viceroys and not the Chiefs of Departments, as that of
Bexar, are to be understood.   Admit, for the sake of argument,
this construction to be correct.   The Viceroy was *alter et idem*
with the King, in his province.   (1 White, 367, 369, 370.)
So the Political Chief of a department, was *alter et idem* with
the Viceroy, in his territorial limits.   This was the theory of
the government.   But this construction of the laws, orders and
decrees, referred to, is too limited.   The language is " the
Viceroys and Governors of new provinces and other magis-
trates."   But, granting all that can be demanded by any con-
struction of those laws, orders and decrees, it would simply
follow that a grant by a Chief of one department was subject
to revision; and such grant, having all the forms of law, not
actually annulled by superior authority, would be received as
evidence of title.   (United States v. Clark, 8 Pet. R. 451.)
We have seen that the title would issue in the department
where the land was situated; and, if not objected to, by the
revising power, would express on its face, no approval or con-
firmation.   (2 White, 65, X.)   To deny the granting power
to the Political Chief, is virtually to deny that there was any
granting power in the provinces; which would be contrary to
what we have seen to have been the law and fact, from prior
to 1754, down to 1821.

The only question remaining for consideration, is the power
of the Political Chiefs, after the Declaration of the Indepen-
dence of Mexico, up to the date of the grant by Sancedo, June
8th, 1824.   On the 5th of October, 1821, the Sovereign Gu-

bernatorial Junta passed decree No. 4 as follows: "The Sov-
"ereign Gubernatorial Junta of the Mexican Empire, consid-
"ering that, from the moment of the Declaration of its Inde-
"pendence of Spain, all the authority necessary for the exer-
"cise of the administration of justice, and other public func-
"tions, ought to emanate from itself, has thought proper to
"legalize and confirm all the authorities, with the attributes
"as at present, and in conformity to the plan of Ignala and
"the treaties of the city of Cordova, for the legitimate exer-
"cise of their respective functions." (Collection of Decrees,
Vol. 1, p. 3.) Again, "That, for the present, and until the
"sovereign power may resolve otherwise, on failure of a Pol-
"itical Chief and Proprietary Intendant, the most ancient
"member of the Deputation may be Political Chief, may pre-
"side over it, provided he be not an ecclesiastic; and in that
"case, the most ancient secular shall be the Political Chief,
"and preside." (Collection of Decrees, Vol. 2, p. 71.) This
decree is dated 6th May, 1822. The General Colonization
Law of 4th of January, 1823, related to the introduction of
foreign emigrants; and on the 11th of April, 1823, it was
suspended. That law cannot, therefore, affect the question
before the Court. The constitutive Act of the Mexican Federa-
tion, of the 31st January, 1824, established a general provi-
sional government, and left the officers, in the State and Pro-
vincial Departments, as under decree No. 4, of the 5th of Oc-
tober, 1821. The 25th Article contains a recognition of that
decree. There was no change, then, as to the attributes of the
Political Chiefs, as the result of the Declaration of Indepen-
dence of Mexico, and subsequent changes, up to to the 8th of
June, 1824, the date of our grant. The Constitution of the
United Mexican States was adopted on the 4th of October,
1824; and the National Colonization Law, on the 18th of
August, 1824. With these we have nothing to do, in this dis-
cussion, as the date of our grant is anterior to both.

It would seem, then, from this review of the law, that San-
cedo had the power to do, what he purports to have done,

on the 8th June, 1824. But, if he had not that power, by virtue of his office, under the laws, orders and decrees, referred to, must the act necessarily have been one of usurpation? We have seen that in the theory of the government of Spain, and after the Revolution, the heads of departments were the channels of communications. The people were reached only through them, whether for evil or for good. The exercise of authority under such a system is almost conclusive, as to its legitimacy. And especially is it so, when the act in question is not one of an isolated character, and of a secret nature. As matter of history, the Court will notice, that more than two hundred titles have been publicly issued by this same officer, and recorded in the public archives of the country.

But again: The facts connected with Austin's colony, as contained in 1 White, p. 96, 97, 98, rebut the charge of usurpation, in Sancedo. On the 16th July, 1823, Luciana Garcia, Governor *pro tem.* of the Province of Texas, commissioned the Baron de Bastrop to issue titles to the colonists of Austin's colony. On the 23rd June, 1824, fifteen days after the date of the Bastrop grant, Sancedo, as Political Chief, transmits his orders through Bastrop, to the colony of Austin. On the 22nd June, 1824, Sancedo gives directions as to government dues, and stamp paper, authorizing common paper to be stamped, &c. In view of all these facts, it would be strange indeed, that Sancedo could control the land system of the country, but could not issue a title himself. It is more reasonable to conclude, that what a man can do by another, he can do himself.

*I. A. Paschal*, also, for appellants. The official capacity of Sancedo, and the execution of the grant, having been fully proved, the presumption of the law is in favor of the authority of the officer, and the legality of the grant. This is the doctrine settled in the case of the United States v. Arredondo, and by this Court in a series of decisions. (See Hancock v. McKinney, 7 Tex. R. 384; Edwards v. James, Id. 372.) I am aware that, according to these decisions, this grant must be

sustained, unless it be affirmatively and clearly shown that the act of Sancedo was illegal, and without authority.

I shall not pretend to deny, that, under the Spanish Monarchy, the power of granting lands was expressly conferred by law, upon the Intendentes of the army and the treasury. But a grant might be made by the King of Spain through one of his subordinate officers, without the intervention of the Intendente. Such were the grants of the Governors General of Louisiana, and all the grants, perfect and imperfect, made by the Governors of Florida; particularly the grants of Arredondo and Perchman. After the Independence of Mexico, the new government succeeded to the powers of the King of Spain. This power at first vested in the Sovereign Junta and Regent; afterwards in the Emperor and Junta; and then in the Supreme Executive Power and Constituent Congress. The grant in question was made when the Supreme Power of the Mexican nation was vested in the Supreme Executive Power and the Constituent Congress. Then any letters of instruction, cedula, decree, or orders, from the Supreme Executive Power or Constituent Congress to Sancedo, directing him to make the grant in question, would have been his law or authority for the same, and as full and complete as the letters, orders, cedulas and decrees of the King of Spain, referred to in the case of Arredondo and Perchman.

The Intendencies had been suppressed before the extension of this title. The decree of 29th October, 1822, page 87, 2nd Vol., Galvan's Decrees, is in the following language: "That "the Intendency General of Army is hereby suppressed, in "the same manner as is done with the exchequers (conta- "dura ——) and treasury of the proper branch, by decree "of 11th March of the present year."

Under a decree of 3rd April, 1823, we find it provided, that the Supreme Executive Power command to be carried into proper (a puro) and immediate effect, in all its parts, the order of 11th of March of the past year, charging upon the Provincial Deputations that they shall undertake its fulfilment. (Vol. 2nd Galvan's Decrees, page 91, (nota) first.

This order of March 11th, 1822, was one making it the duty of the Regency, to immediately notify all the Intendentos, that, within the space of thirty days after the receipt of the order, and under the penalty of losing their office, they should make known what general and particular imposts were collected in their provinces; the product of each year, deducting a fifth part; what number of officers were paid from the public treasury; and what were their employments and salaries; what offices were vacant, and what were filled by officers *ad interim;* what troops were maintained in the provinces; what were the fixed amounts to be paid out by the treasury, and the monthly excess, or deficiency. (2d Vol. Galvan's Decrees, p. 9.)

This, then, was the duty devolved upon the Provincial Deputation on the 3rd April, 1823, as above stated; the Intendentes having failed to give the information; and their officers having been suppressed.

The reinstallation of the Provincial Deputation, in Monterey, composed of the three Provinces of the Kingdoms of Nuevo Leon, Coahuila and Texas was decreed. (See 2nd Vol. Galvan's Decrees, page 96.)

On the 18th of August of the same year, there was a decree establishing Provincial Deputations in each of the above three Provinces. (2nd Vol. Galvan's Decrees, page 159.)

The attributes of the new Provincial Deputations were declared by decree of 11th July, 1823. The first Section provides that they " shall scrupulously watch over the manage-" ment and administration of the public property in their re-" spective provinces, being able to suspend the officers of the " branch of the treasury, when they observe that they abuse " or do not comply with their duties, giving an immediate ac-" count thereof to the Supreme Executive.

" 2nd Section. They shall present to the Supreme Execu-" tive Power, the numbers (*ternas*) of all the officers of their " respective provinces, of the political orders of the Treasury " and of the Judicial Departments, except the Audiences, " Political Chieftancies, and the Secretaries of the latter.

24

" 3rd. Section. To carry out the powers in this decree, the " concurrence of seven members of the Deputation were neces- " sary.

" Section 4. The Executive and the Political Chief, as the " case may be, shall oblige the members of the Deputations, " or in fault of these, their substitutes, to assemble in ses- " sions." (2nd Vol. Galvan's Decrees, page 146.)

By this decree the new Provincial Deputation might watch over those who administered the Treasury Department, which included the distribution of lands ; but could not act in that capacity themselves. Indeed this would have been impossi- ble on account of their number, except through their head, the Vocal Primero, or Political Chief.

The Provincial Deputations were installed October 31st, 1823. (2nd Vol. Galvan's Decrees, page 188 ; Decree of 16th September, same year.) Two days thereafter, a decree was passed for the distribution of lands to individuals belonging to the troops of the provincial and local militia. (See Decree of 18th September, 1823, 2nd Vol. Galvan's Decrees, p. 180.)

This was an extension of decree of 4th June, 1823, which provided for distributing land among the regular soldiers. (See 2nd Vol. Galvan's Decrees, p. 123.)

The decree of 14th October, 1823, entitled the formation of the Province of the Isthmus, was intended to carry into effect the above decrees for the distribution of lands to the retired military. The 3rd Section provides : " The Executive shall " nominate a superior Political Chief, conferring upon him the " charge of Intendente, who shall proceed to organize the " Provincial Deputation," &c.

The 7th Section shows how the vacant lands in that pro- vince were to be divided.

The 8th Section provides, that the Executive might appoint a director or distributor of lands, and there should be given instructions, &c.

The 9th Section shows that the land given to the military, was to be in consideration of merit, and proportioned to the

salary which they ought to enjoy, on retiring. (See 2nd Vol. Galvan's Decrees, p. 197.)

We learn from this decree, which was made for the new Province of the Isthmus, two important facts: First, The faculty or power of an Intendente was given to the Political Chief, who consequently had the power to grant lands. Secondly, The Supreme Executive might nominate a director or distributor of the lands, to whom the Executive should give such instructions as were necessary. This plan of the formation of the Province of the Isthmus, being intended for the retired military, strangers and colonists, did not carry out the decree of 18th September, 1823, for the troops of the local and provincial militia, and who were then in the pursuits of peaceful life, and scattered throughout all the provinces. Consequently, lands had to be distributed to them by special agents, or the Political Chiefs under the instructions of the Chief Executive.

By an order of the 5th June, 1822, it appears that the Political Chiefs were made the medium through which communications passed from the Provincial Deputations to the Supreme Executive, and from the Supreme Executive to this body, except in cases in which charges were preferred against the Political Chief. (See 2nd Vol. Galvan's Decrees, p. 48. "Orden.")

By decree of 6th May, 1822, the Political Chief is styled an Intendente. The language of the preamble and first Section must be particularly noticed. The preamble is as follows:

"The Sovereign Constituent Mexican Congress, in order to "give to the administration of public justice a prompt and "expeditious course, which under present circumstances is re-"quired, and that there may be no doubts as to who should "be substituted, in case of the death, absence or want of a "Political Chief of the Provinces, have resolved to decree:"

"1st. That for the present, and until the Supreme Execu-"tive may resolve otherwise, in fault of a Political Chief and "Proprietary Intendente, (a falta del Gefe Politico y Intendente

" Proprietario) shall be Political Chief and preside over the
" Provincial Deputation, the most ancient member of it, pro-
" vided he be not an ecclesiastic, in which case the second most
" ancient shall preside." (2 Vol. Galvan's Decrees, page 40,
Decree 6th May, 1822.)

Here it is clearly shown that the Political Chief was, ex-
officio, Proprietary Intendente—and that in the failure of the
Political Chief, his place was filled by the most ancient mem-
ber of the Provincial Deputation, or "Vocal Primero"—as
Sancedo styles himself—or Vocal mas antiguo, as in the law.

In the preamble it does not say in case of the absence both
of Political Chief and Intendente—but only of the Political
Chief.

In the first Section, he is styled Political Chief and Inten-
dente—showing clearly that he acted in both capacities.

This law is conclusive of the power of the Political Chief,
or of the "El Vocal mas antiguo," or "El Vocal Primero,"
acting in his stead, to grant lands as fully as the Intendentes
could, when they existed, and, consequently, the power to con-
firm a grant, referred to the Intendente.

Again, in a decree of 29th October, 1823, it is declared,
" That the Executive shall provide the officers of the Treasu-
" ries, which the territory of the various provinces compre-
" hends, without the necessity of being previously presented
" by ternary (*deternas*) members of the Provincial Deputa-
" tion ; it being understood that this resolution shall continue,
" whilst said Treasuries remain as they are." (2d Vol. of
Galvan's decrees, p. 206; "Decreto 29 de Octubre, de 1823.")

Now, whether we consider the Political Chief, *ad interim*,
being "El Vocal Primero" of the Provincial Deputation,
acting under the powers conferred upon the former Intendentes,
or under special instructions from the Supreme Executive, or
as a Treasury officer appointed by the Supreme Executive,
or as the official head of the Provisional Deputation, his acts
would be regarded as legal, and the grant sustained.

The law of 4th June, 1823, which provides for the distri-

bution of lands to individuals of the " Permanent Army," is very important, as it was in virtue of this law and that of 18th September, extending its provisions to those who had served in the Local and Provincial Militia, that the title in question and many others in this country are held—particularly all the labors around the extinguished Missions, granted since the Mexican revolution ; the first colony of De Leon and the grant in the junction of the San Antonio and Guadalupe rivers.

The law then is as follows :

" The Sovereign Constituent Mexican Congress, highly con-
" vinced of the great virtues which characterize the national
" army of permanent force, no less than of its indefatigable
" zeal and constant services for the general good and prosper-
" ity, and being desirous of giving the most unequivocal proofs
" of the singular appreciation in which it is held, has decreed:

" 1st. That in preference to all other things, a copy be sent
" to the Supreme Executive power, of the exposition made on
" the 4th of April last by the Generals, Marquis of Nivanco,
" and Don Jose Antonio de Schaverres, in order that in con-
" formity to these propositions, it may make effective the as-
" signation and distribution which they solicit.

" 2nd. That the same Supreme Executive power designate
" the properties which it may consider proper to distribute in
" the immediate neighborhood of the Court, or in any other
" place where it may be useful.

" 3rd. That the Supreme Executive power shall likewise
" form the regulations most adequate for the election of per-
" sons (the distributees) the order and mode in which the dis-
" tribution ought to made." (See 2nd Vol. Galvan's Decrees,
pages 123, 124.)

The decree of 18th September, 1823, only extended this Act to those who had served in the Local and Provincial Militia during the struggle for independence, of whom the Baron de Bastrop was, historically, one of the most distinguished, and the quantity of land did not exceed his merits.

The 10th Section of the General Colonization law of 18th

of August, 1824, declares, " The Military who, in conformity " to the offer of 27th of March, 1821, have a right to lands, " shall be observed in the States, upon sight of the patents, " which, for the purpose, the Supreme Executive power shall " transmit them."

By the 10th Section of the Colonization Law, (C. & T.) the military were also provided for.

The offer of 27th of March, 1821, we have not before us, but we find that from this date forward, it was a favorite plan of the new government, to reward those who had served in the defence of the country, and the lands were always given to merit, instead of being sold.

*V. E. Howard*, for appellees.   We insist that it was never the intention of the Cortes, by the Constitution of 1812, to change the granting power of the royal or public domain. They left it where they found it.   The Capitulo III, Art. 1, of the Constitution of the Cortes, defines the powers generally of the Political Chiefs, and shows them to have been mostly that of police, relating to municipal affairs.   Art. 19, of the same title, which is relied on as giving the power to grant lands, as will be seen by referring to the immediately preceding and succeeding articles, relates to matters of church polity, which had previously rested in the King.   " The King, " and the Regency in his place, shall be able to delegate to the " Political Chiefs beyond sea, the exercise of the faculties of " royal patronage (or presentation to ecclesiastical benefices) " according and as hitherto has been done with the Governors " of those provinces in all their extensions according to the last " laws and dispensations."   The word used in the original is *patronato* ; and the true definition is the one given above in brackets.   It never was intended to carry the power of granting lands.   The language, itself, carries no power for granting anything, it only says that the King or Regency shall have the right to grant this royal patronage to the Political Chiefs ; and admitting that it was intended to grant the power of conceding

lands, it would be necessary to show a decree actually conferring the power, before it could exist under the above article. A right to raise a power is not synonymous with a power conferred. And if the King or Regency ever conferred the power. it would be necessary to show some act of the Mexican government, conferring the power upon the Political Chiefs after the revolution, or it never existed under the new government.

After the restoration of Ferdinand 7th, to power in 1814, on the 4th day of May of that year, he annulled the Constitution of the Cortes, and with it the power whatever it was. In December of the same year Ferdinand re-established the laws of the Indies, so far as they had been previously repealed, together with the officers and their jurisdiction, as they existed previous to his expulsion in 1808, from the government; specially repealing the powers of the Political Chiefs and Provincial Deputations. (2 White, 155, 166, 173, 188.) It is obvious that from 1812, to the time of the Mexican revolution, in February, 1821, the Political Chiefs had no power to grant, and that this power was in the Governors and Commandants, subject to the confirmation of the Intendant. (United States v. Clark, 8 Peters; Acosta v. United States, 1 Howard, 25.) The largest portion of the grants in East Florida, were made by the Governor after 1812.

From his restoration until March, 1820, Ferdinand reigned with absolute power. But another revolution having broken out in Spain in 1820, the Constitution of 1812 was again re-established by Fernando and the Cortes; but the granting power as to lands still continued in the Governors. Austin received his first concession from Governor Martinez at Bexar in August, 1821; and his subsequent trip to the city of Mexico, or that of his son, grew out of the fact that the revolutionary Governor did not recognize the validity of a grant by a Spanish Governor, made after the Declaration of Independence. (1 White, 560, 561, 568.)

The colonization law of 1823 was the first law that authorized the granting of lands; this was again repealed with a

saving clause for Austin. The next law was that of the Supreme Government in 1824, under which the State law of 1825 was framed. The law of 1824 acknowledges the title to lands to be in the States. This was the effect of the constitutive Act promulged in May, more than a month previous to the confirmation of Sancedo.

Under the State government of Coahuala and Texas, no officer had any power to grant, previous to the colonization law of 1825. This was the decision of the government itself. It required all grants made previously, by any officer assuming to grant, to be ratified under the colonization law. (Orders of 1828, 1831, and the 47th Art. of the colonization law.) All those grants made by Sancedo in 1824, which were not subsequently ratified, under the colonization law, were declared void by the Political Chief in 1834, who indorsed on them that they were void for the want of the approbation of the government. It would appear that this construction of the powers of the Political Chief, should be held conclusive, as it was by the government which is presumed to be the best judge of the powers of its own officers.

The decree of Mexico (Vol. 1, p. 3,) only continues the usual functions of the ordinary officers. The Intendant, referred to, (Vol. 2, p. 40, and 25 of the decrees of Mexico,) is a mere revenue officer. (Dic. Legislation, *verbo Intendente*.) He was given no power to grant lands by any of these laws.

Neither could the Political Chiefs derive this power under the Constitution of the Cortes, because neither the King nor the Regency, in point of fact, ever acted so as to vest the power and none existed at the time of the revolution in Mexico, or was afterwards conferred by Mexico. In truth, the Political Chief never had the power to grant land, either under the government of Spain, Mexico, or Coahuala and Texas.

It cannot be shown that such a power was recognized under either government. At the time the revolution broke out, the Spanish Governors were in the exercise of the power; and if it could have been continued under the general laws of the

country, it would have devolved on the Governors of the new government and not on the Political Chiefs. It is difficult to understand, on general principles, how land which had vested in the new government, could, by force of the revolution, get out of it, but in virtue of some law creating the power, and designating the agent or officer by whom it should be exercised. No party can be divested of property except by his own act, or that of some lawfully authorized agent.

The verdict having been given by agreement *pro forma*, it cannot be said that the judgment is effected by illegal evidence or erroneous charges. The cause on the facts and the law is before the Supreme Court as fully as though it had been tried without the intervention of a jury. If it may not be said that this Court is to presume everything found for the defendants, which the jury might have passed upon, at all events, it would not be authorized to reverse, unless the judgment is clearly against the weight of evidence.

II. Since the trial of this case, the public records have been returned from Austin to Bexar, and the decree of Salcedo, annulling the grant of Cordero, has been discovered. A certified copy of it is herewith filed. This decree was a law under the Spanish system, and being such the Court will take judicial notice and cognizance of it, especially as it is only confirmatory of the evidence of Seguin.

III. It is assigned for error, in this case, that the Court refused to permit the appellant to offer in evidence his locations of the land, made during the progress of the suit, and while the defendants were in actual possession. This was not error, it being proved, that defendant had a valid grant. (Hoofnagle v. Anderson, 5 Pet. Cond. R.) According to Judge Marshall they were not evidence for any purpose. (Stringer v. Young, 3 Peters.)

Again, it was void as the purchase of a litigious right, and as against the law of champerty, which is a Common Law offence, and therefore prohibited by our law. The defendants were at the time in actual adverse possession. (4 Kent, 448.)

*W. E. Jones*, also, for appellees. What officer, under the new government, succeeded to the authority of the Intendant General? In whom was vested the power of confirming incomplete grants, made by the Spanish Governors?

Neither the Colonization Law of Iturbide, nor that of the General Congress which succeeded it, made any provision upon this subject. They refer solely to the distribution of lands in future. They contain nothing touching the confirmation of inchoate grants by the prior government.

The counsel for the plaintiffs (Mr. Phillips) refers to the decree of the Junta of Mexico, of 5th October, 1821, which confirms and continues, until otherwise provided, the functions of the various officers of government.

Now if, by this decree, the functions of the Intendant General of San Louis were continued, as they existed under the government of the King, then that officer was still the proper functionary to confirm grants to land. If the office of Intendant was discontinued, like that of the Viceroy, by force of the Revolution, and as incompatible with the new order of things, then the power which he had exercised became dormant or lapsed until vested by the new government in some other officer; and until vested by some positive act of legislation, it existed nowhere. The plaintiffs title derives no aid from either alternative.

It may not be improper here to investigate and determine what were the powers of the Intendants General.

By the Royal decrees of 1754 and 1786, the Empire of Spain in America was divided into twelve Intendancies, one of which was established at San Louis Potosi.

The Intendants in Mexico were civil and military Governors of extensive authority, next in authority to the Viceroy, and in some things independent of him. They were exclusive judges of questions tonching the public domain; and all persons petitioning for new grants of land were compelled to present them to him for confirmation; (2 White 67—71; 2 White, 161, 169, Section 9; 1 White, 359;) embracing a pe-

riod from 1754 to 1814. The Intendente of Cuba at the present day occupies precisely that relation to the Captain General—subordinate to him in some respects; independent of him in others. It will not be denied that these Intendancies continued during the Spanish rule in Mexico, and that, at the time of the grant to Bastrop, the Intendant of San Louis was the officer authorized to confirm the grant of Cordero, and that he was the superior authority to whom Cordero refers the matter.

The formal Declaration of Independence by Mexico, was promulgated in September, 1821 ; and immediately thereafter the Sovereign Gubernatorial Junta assumed the Legislative power. One of its first decrees was that already referred to, cited by plaintiffs counsel, confirming and continuing the functions of all officers of government. A similar decree was passed by the General Congress, after the dethronement of Iturbide.

The decree of the Junta of 20th November, 1821, divided the Empire into six Captancies General, and established their authorities and jurisdiction. This decree does not appear among the published decrees, and we only know its existence from the supplementary decree of 15th January, 1822, Vol. 1, p. 90, in which the previous decree of November, is approved and confirmed in all its twenty-six articles. In this latter decree, although there is nothing specified, there are expressions which lead to the supposition that the Captains General were substituted, under the new government, for the Intendants General under the old, and that they succeeded to their powers and jurisdiction.

This view is strengthened by an examination of the decree of 9th September, 1823, Vol. 2, p. 173, in which the office of Captain General is abolished and Commandancias Generales established in lieu of them. The limits within which the Commandantes Generales exercised jurisdiction, are declared to be the same as those of the Intendancies, except as excepted in that decree.

The Intendancies, here referred to, are evidently those which existed under the old government; and that it was intended to make the jurisdiction of the Commandancias Generales, co-extensive with that of the Intendancies, as they existed at the date of the revolution. Each Commandancia embraced several Territories; and in each Territory was a Commandant of arms, who was its Governor.

From these decrees, the inference is fairly deducible, that under Iturbide the Captains General succeeded to the jurisdiction of Intendants under the King, and that the Commandants General, succeeded to it under the Constituent Congress, after the overthrow of Iturbide. The suppressed decree of 20th November, 1821, would probably solve the difficulty.

These Commandancias have existed from the period of their establishment in 1823, with the exception of the period of the supremacy of the Federal government, down to this time, with some modifications. They have ever been and are now, vested with high civil and military authority.

But if we are left in doubt as to what officer, if any, succeeded to the authority of the Intendant General of San Louis Potosi, we can scarcely be at a loss to determine that the Political Chief did not. The mantle of the Intendant scarcely fell upon the shoulders of the Political Chief of Bexar. So strange a departure from the ordinary course of Mexican Legislation, could not have occurred and no trace of the law be found.

The powers and duties of Political Chiefs are specifically defined in the decrees of the Spanish Cortes. No authority is there conferred to grant lands or confirm grants. In the decrees of Mexico, from 1821 to 1824, they are scarcely noticed, and no additional authority is conferred on them. Under the government of Coahuila and Texas, when a more liberal system of granting lands obtained, the power to grant was still placed in higher functionaries than the Political Chief.

The decree of the Cortes of 4th January, 1813, for the distribution of the public lands cannot be invoked as authority

for the confirmation of Sancedo. That decree provides that half the public domain shall be reserved for the payment of the national debt; that retired officers and soldiers, honorably discharged, shall receive portions, and that the citizens, who are not land holders, shall also receive portions. It is made the duty of the Ayuntamientos to divide the lands into lots. These are to be distributed by lottery; and finally the Provincial Deputation must approve each claim. The Political Chief is not named in the decree; and no power over the public lands is vested in him by it.

It is doubtful whether this decree was in force at the time of Sancedo's confirmation. It is omitted by Mr. White, in his collection of the decrees of the Cortes, which are considered in force in Mexico. It is embodied in the collection of decrees, published in Mexico in 1829. But the author of Febrero Mexicano, 1st Vol. p. 46, Sec. 31, in commenting upon that collection, declares that the editors did not assume to say that all the decrees contained in it were of force.

The plaintiffs also rely upon locations, made upon the land after the commencement of the suit. This question was settled by this Court in Hamilton v. Bradford, decided at the last Term.

*R. Hughes*, also, for appellees.

LIPSCOMB, J.  The appellants in this Court, brought suit in the Court below, against the defendants, to recover four leagues of land. In support of their title, they relied on a grant issued by Jose Antonio Sancedo, Vocal Primero of the Most Illustrious Deputation, and Political Chief, *ad interim*, of the Province of Texas, on the 8th of June, A. D., 1824, to the Baron Bastrop. In the Court below, after hearing the evidence, a jury was waived by the parties, and the case was submitted to the Judge, on the facts and the law. The judgment was for the defendants, from which the plaintiffs appealed. As the plaintiffs must depend upon the validity of their own title, it is not

our purpose to decide upon the validity of the Veremendi grant, under which the defendants claim; nor is it considered necessary to decide upon the various rulings of the Court, in the progress of the trial, and presented by the several bills of exception, further than to determine whether any of such rulings, against the plaintiffs, could affect the validity of the title under which they claim.

It is objected that the grant of Sancedo to Bastrop is void: first, for the want of authority in the grantor; and secondly, that it had been adjudicated to be invalid, and the lands, comprehended in it, declared to be vacant, at the time of the grant to Veremendi. We propose to consider the last, first: If the title of Bastrop had been adjudicated by authority, shown to be competent in law, its decision would be conclusive; or if the authority had not been fully shown, the presumption that they had authority to act in the capacity assumed, would be held sufficient, until a want of authority was shown. The propriety of indulging this presumption, in such cases, cannot now be considered an open question in this Court. (See Hancock v. McKinney, 7 Tex. R. 384; Titus v. Kimbro, 8 Id. 210; Jenkins v. Chambers, 9 Id. 167; Bissel v. Haynes, Id. 156.)

But it is very clear, that in this case, the evidence shows no such adjudication, on the grant in question, was ever made; and the adjudication spoken of by the witness Navarro, had no reference to this grant: so far from it, that he testified that he did not know of its existence, until within a few days of the trial. His evidence had reference to the inquiry, made when Veremendi applied to have his grant located on the same land; that it was adjudged to be vacant, without any reference to the validity of Bastrop's grant; and he says that if its existence had been known before extending title to Veremendi, Bastrop's grant would have been referred to the Governor, or superior authority, to dispose of its validity. This objection is therefore not well taken. We do not wish to be considered as ruling that an adjudication to set aside a previous grant, in all cases, is necessary. In some it may not be, as has been held by this Court. (Holliman's heirs v. Peebles, 1 Tex. R.)

The authority of Sancedo, to grant land, is denied. It is contended that his official character of first of the Provincial Deputation, and Political Chief of the Department, conferred upon him no power to grant the lands appertaining to the public domain. What credit should be accorded to the acts of an officer, assuming to discharge an official attribute, in the absence of all evidence to show what are his precise powers, has been too well settled in this Court, to allow a discussion on the subject. We have held and do hold, that he is presumed to act within the scope of his legitimate powers. We did not indulge the hope, when the recognition of this principle was enunciated and adopted, that it would receive the unqualified and universal approbation of the profession. Experience would have taught us but little, if we had yet to learn, that the plainest principle of jurisprudence, founded on the purest equity, and sanctified by the wisdom of ages, when it interposes a barrier to long cherished hopes, is denounced as a novelty, unknown before to the jurist of the age. But one thing is certain, that we will never be driven from our own solemn conviction of the truth and soundness of the principle, by bitter and sarcastic allusions to it.

But, although the presumption is, as we have stated, in favor of the legality of the act so done; yet, it is only a presumption, that would at all times give way to evidence to show that the authority exercised, did not appertain to the person or officer so exercising it. The mode and evidence, by which this want of power may be shown, like the proof of other facts, must depend upon circumstances. If the powers of the officer are defined by written law, known and accessible, it would be the best evidence; but, if the written law could not be procured, nor written instructions, but the powers depended on verbal instructions, or upon custom, then verbal testimony could properly be resorted to. If there is any written law defining the powers of the Political Chief of the Department, in relation to the granting of the public domain, it has not been shown; nor are we advised of its existence; and, in the period

of a few years from the subversion of the Spanish monarchy,
to the settlement of a regular organized government under the
Republic, it may well be supposed, that it would be difficult, if
not impossible, to find any written law or instructions defin-
ing and regulating the powers of the various officers employed
in the public service. Under such circumstances, it is not
believed that secondary evidence should be excluded. The
only positive verbal testimony, received on the trial, in rela-
tion to the powers of Sancedo, as Political Chief, is that of
Antonio Navarro, a witness, who from his being, a short time
subsequent to the date of the confirmatory grant to Bastrop,
so much employed officially in the issuing titles from the
government to numerous grantees, had facilities and oppor-
tunities to be well acquainted with the system in use, as well
as with the archives of the government in relation to land titles.
His evidence is positive and explicit, that " The first power
" to grant lands after the Mexican Independence, first com-
" menced with the State Colonization Law. Then there were
" officers to grant land. I considered Sancedo had no power
" to grant land, in 1824. The Law of Colonization of 1825
" having been published, the government ordered the Political
" Chief, that all titles that had not been paid for, those given
" by incompetent authority, or those which were incomplete
" under the Spanish Law, should be completed under the Col-
" onization Law, and that titles, given by incompetent author-
" ity, as Alcaldes and Political Chiefs, during the time the
" State Government did not exist, should be completed under
" the Colonization Law. These orders were repeated at vari-
" ous times, after the publication of the Colonization Law.
" They existed in the archives at this place. The grants made
" by Sancedo, in 1824, which were not subsequently confirm-
" ed under the Colonization Law, the government disposed of;
" and the Governor of the State instructed the Political Chief
" to make it known. The parties were notified by him. In
" fact, many titles were never claimed, they being considered
" null and entirely terminated and ended, null and of no value.

" This order existed in the archives of Bexar." It was proved that they were not to be found among the archives in the office of the County Court at Bexar. In addition to the evidence of Mr. Navarro, it will be seen in the whole proceedings in relation to Austin's colony, commencing with a petition to the Governor of Texas, and by him referred to the Commandant General of the Eastern Provinces, before the Revolution, and the concession of the Governor of Texas after the Revolution, its ratification by the Constituent Congress of Mexico, the appointment of a Commissioner by the Governor of Texas, that it was all through the Governor, Sancedo, the Political Chief being only recognized, not as the granting officer, but as the medium of correspondence, down to within a month of the date of the supposed grant of confirmation by him to Bastrop. It shows that at that time, titles were extended by a Commissioner, appointed by the Governor, and acting under his authority. (See 1 White Recopolacion, Laws, Orders and Contracts for Austin's Colony.) There is not the slightest vestige of proof, either written or verbal, that the Political Chief of the Department of Texas, had, under the authority of Spain or Mexico, until after the Colonization Law of 1825, any power to grant or confirm land titles. It appears that the only connection he ever had, on the subject, was as a medium of correspondence, between the granting power and the grantee. If the Political Chief had more extensive powers, comprehending authority to grant or confirm titles, at the time Sancedo discharged the functions of that office, it was an exception to the laws and usages on the subject; and as an exception, the party claiming the benefit of such exception, ought to show that the exception really existed. The presumption in favor of the legality of the acts of an officer, of itself, would not supply the want of such proof.

There was an effort made in the Court below, to impeach the grant of Sancedo, in a direct way. A witness was called to prove that he was the person whose name appeared to the grant, as one of the assisting witnesses, and that he did not

26

sign his name, as an assisting witness, and that he could not write his name. This evidence, on the objection to its admissibility, was excluded by the Court. We recognize no rule of the laws of evidence, that would exclude such testimony; and it would seem that the wish to exclude it on the part of the plaintiffs, would cast a suspicion on the genuineness of the grant and would be an additional circumstance, rebutting any presumption in favor of the validity of the grant.

We believe from the views expressed, that the jury would have been fully sustained in finding that the grant of Sancedo was without authority of law, and a usurpation of power. The judgment is therefore affirmed.

Judgment affirmed.