CRESPIN *v.* UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 6. Argued October 12, 1897. — Decided November 15, 1897.

The plaintiffs claimed as heirs and legal representatives of the original grantees under a grant alleged to have been made March 24, 1840, by "the prefect or superior political chief of the district of Bernalillo," in the Republic of Mexico. There was no evidence that the grant of the prefect ever received the sanction or approval of the governor, the ayuntamiento, or other superior authority of the Mexican Republic. *Held,* that it was beyond the power of the prefect alone to make the grant in question.

Possession of land so granted after the date of the treaty of Guadalupe Hidalgo, however exclusive and notorious, cannot be regarded as an element going to make up a perfect title.

THIS was a petition by Crespin and about forty others for the confirmation of what is commonly known as the San Antonito grant, situated in Bernalillo County, New Mexico, and alleged to contain 32,000 acres.

Plaintiffs claimed as the heirs and legal representatives of the original grantees, and set forth in their petition that, on March 24, 1840, the Republic of Mexico, through Antonio Sandoval, "the prefect or superior political chief of the district of Bernalillo, thereunto duly authorized by the laws, usages, customs, superior orders and decrees of the said Republic, or of its duly constituted and competent authorities," granted and delivered possession of this tract of land unto the grantees therein named; that the original grant or *expediente* of title remained in the office and formed a part of the archives of the said prefect, and that an official copy or *testimonio* was at the time delivered to the grantees as a complete and final title in fee.

That the petitioners were unable to find the original *expediente,* which, with a large part of the other public archives, was lost, destroyed or stolen, and that the official copy, or *testimonio,* had also been stolen; but that, while the *expediente* was in the archives of the prefecture, a *testimonio,* or

true copy, thereof was made by one Rumaldo Chaves for his own use, and that such copy was, prior to 1846, transferred and delivered by said Chaves, by indorsement thereon, unto Gaspar Atencio, one of the grantees of the original grant, for his uses and purposes, and has ever since remained in his possession.

The petitioners further alleged, upon information and belief, that the grant was finally confirmed and approved by Governor Manuel Armijo and the departmental assembly, and that by virtue thereof an allotment was made in severalty to each of the grantees, and juridical possession given to such grantees by José Trujillo, in accordance with the decree of the prefect and the laws then competent and in force in said territory, and that the grantees since then have been in open and notorious possession of the tract. The remaining allegations of the petition are immaterial.

Upon the trial of the case, plaintiffs offered in evidence a petition addressed to " Señor Prefect Don Antonio Sandoval " by " Juan José Garcia and Gaspar Atencio, residents of the demarkation of Albuquerque," stating that they and their constituents, finding themselves without tillable land by which to subsist, " and there being back of the Sandia Mountain a tract of land called San Antonito, the fertility of which and the increase of whose waters all invite its cultivation, by this means the commendable promotion of agriculture and the progressive benefit of the petitioners will be accomplished," they inform the prefect " that it is fifteen years, a little more or less, since this tract was donated to Cristobal Jaramillo, deceased ; yet, moreover, in all this space of time, said land has not been cultivated at all, and if this has been forfeited in accordance with our laws, we humbly beg your honor to be pleased to grant us what we ask, as it is without prejudice to a third party."

In compliance with this petition, the prefect, signing himself simply " Sandoval," made an order, under date of March 21, 1840, that the petition be transmitted to the justice of the peace of Los Ranchos to report in detail the nature of the land and the need of the petitioners.

On the following day, José Trujillo, the justice, filed his report, stating that, after having fully informed himself as to the nature of the lands, " it is fitted for agriculture, very pleasing and very delightful for a life of tranquillity, very favorable to everything for a most comfortable living," and that the petitioners are in need of landed property, with the exception of three persons named, who are known to have land, but do not count upon it, because they are in debt and have it secured by said lands, and that all the others have not such property.

Upon this report Sandoval made the following decree:

"BARELAS, *Mar.* 24, 1840.

"One of the most commendable and beneficial things to a people being the promotion of agriculture, let this petition be transmitted to the justice of the peace of Los Ranchos, in order that with all the customary formalities he give the possession solicited by the parties in interest, without prejudice to a third party, and only for cultivation the lands necessary, leaving free the pastures and watering places, which under no circumstances ought to be interfered with; and after this is done he shall make a full report to this prefecture.

"FRANCISCO SARRACINO, *Secretary.* SANDOVAL."

In compliance with this decree, Trujillo, justice of the peace, reported that he had given juridical possession of the lands to the petitioners and their associates to the number of twenty-seven, who were each given one hundred *varas*, except two of the petitioners, who were given one hundred and fifty, in the usual form of livery of seizin under Spanish grants.

The *testimonio*, or official copy of these papers, was not made by the secretary of the Prefect Sandoval, but by Rumaldo Chaves, the clerk of the justice of the peace Trujillo, and seems to have been made for the personal use of Chaves, and afterwards transferred by indorsement to Gaspar Atencio, who appears, from the document, to have been one of the leading petitioners, and received, according to the allotment, one hundred and fifty *varas*.

Plaintiffs next offered in evidence the following *hijuela*, or certificate of allotment, executed April 11, 1840, by José Trujillo, purporting to show an allotment of one hundred *varas* of land at San Antonito to Vicente Samora under the decree of the prefect Sandoval:

"The citizen José Trujillo, justice of the peace of the jurisdiction of los ranchos de Albuquerque, does hereby certify in form of law that one hundred varas of land at San Antonito were donated to Vicente Samora in accordance with and as stated in the general grant made by me, the said justice of the peace, by virtue of the decree of March 24th made by the prefect Don Antonio Sandoval. The foregoing certificate is given at the ranchos this 11th day of April, 1840, I signing it with my two attending witnesses, to which I certify.

"José Trujillo.   [rubric.]

"Attending witness:

"Rumaldo Chavez.   [rubric.]

"Attending witness:

"Pablo Roman Sisneros.   [rubric.]"

Plaintiffs further offered to refer to other cases and documents for the purpose of showing that other grants had been made by prefects, which were recognized and confirmed by the proper Mexican authorities, and, also, that several of such grants had been confirmed by the Congress of the United States.

These documents were all objected to by the Government, and were admitted subject to these objections. Some further explanatory oral testimony was introduced in support of petitioners' claim, but no evidence was offered on behalf of the Government.

Upon this state of facts, the court delivered judgment, dismissing the petition and rejecting the grant, whereupon the plaintiffs appealed to this court.

*Mr. Henry M. Earle* for appellants.

*Mr. Matthew G. Reynolds* for appellees.  *Mr. Solicitor General* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The principal question urged upon the attention of the court in this case is whether, under the laws of Mexico, as they existed in 1840, it was within the power of a prefect to make a grant of public lands.

In endeavoring to ascertain what were the laws of Mexico at any particular time, of which we are bound to take judicial notice, *Fremont* v. *United States,* 17 How. 542, 557; *Romero* v. *United States,* 1 Wall. 721, we are somewhat embarrassed by the frequency with which the government was changed — usually by revolutionary violence — between the time the Republic gained its independence in 1821 and the treaty of Guadalupe Hidalgo in 1848, under which the northern provinces of Mexico were ceded to the United States.  These changes were sometimes accompanied by decrees annulling the acts of previous governments, cancelling grants, and putting new regulations in force with respect to the disposition of public lands.  That these difficulties are of long standing is evident from the comments of Chief Justice Marshall in the case of *Soulard* v. *United States,* 4 Pet. 511, in which the court announced itself as unable to form a satisfactory judgment by reason of its inability to obtain proper information with regard to the laws and principles upon which the transfer of Spanish titles depended, and therefore postponed the final disposition of the case until such information could be obtained.

In view of this and similar difficulties, this court, as early as 1832, in *United States* v. *Arredondo,* 6 Pet. 691, laid down as a general proposition that the grant itself was *prima facie* evidence of its own validity, and that it would be presumed to have been regularly issued until the contrary appeared, or such reasons were offered for doubting its authenticity as were sufficient in law to rebut the legal presumption.  To

the same effect are *United States* v. *Clarke*, 8 Pet. 436 ; and *United States* v. *Percheman*, 7 Pet. 51 ; *Strother* v. *Lucas*, 12 Pet. 410, 437 ; *Reynolds* v. *West*, 1 California, 322, 326 ; *Jones* v. *Garza*, 11 Texas, 186, 207.

The courts of California have carried this principle so far as to hold, though apparently with some fluctuation of opinion, that a grant of a pueblo lot made by an alcalde raises a presumption that the alcalde was a proper qualified officer ; that he had authority to make the grant, and that the land was within the boundaries of the pueblo. *Reynolds* v. *West*, 1 California, 322 ; *Cohas* v. *Raisin*, 3 California, 443 ; *Hart* v. *Burnett*, 15 California, 530 ; *Payne* v. *Treadwell*, 16 California, 220 ; *Leese* v. *Clarke*, 18 California, 535 ; *Donner* v. *Palmer*, 31 California, 500.

In considering their methods of disposing of public lands, this court has had frequent occasion to uphold the validity of grants made by the Governors of the Spanish and Mexican provinces, who appear to have been sometimes also called "Political Chiefs." Indeed under the regulations for the colonization of the Mexican territories of November 21, 1828, the political chiefs were expressly authorized to grant the public lands of their respective territories. Reynolds' Land Laws, 141 ; *United States* v. *Workman*, 1 Wall. 745, 761 ; *Hornsby* v. *United States*, 10 Wall. 224, 231 ; *Vanderslice* v. *Hanks*, 3 California, 27 ; *Leese* v. *Clarke*, 3 California, 17 ; *Leese* v. *Clarke*, 18 California, 535, 546 ; but see *Jones* v. *Garza*, 11 Texas, 186. A similar power seems also to have been vested in the Spanish intendants. Reynolds' Land Laws, 59, 60 ; *United States* v. *Clarke*, 8 Pet. 436, 452.

Prefects were functionaries well known in the Roman law, and under the empire were clothed with extensive powers, both judicial and administrative. With the decline of the empire they seem to have lost their importance and to have finally disappeared ; but, after remaining in abeyance for some hundreds of years after its fall, the office was revived in the eighth year of the French Republic, (1800,) and bestowed upon the heads of the departments into which the country had been divided by the National Assembly in 1790. In the perform-

ance of their duties they were aided by a council of prefecture. The prefect was charged with the administration of local affairs, and was practically the representative of the central government in public matters. The title was carried into several States, whose legislation was framed upon the model of the Code Napoleon, but, until the establishment of the Republic, was apparently unknown in Mexico. It seems to have been recognized, however, prior to 1836, since by the constitutional law or decree of December 29 of that year, defining the powers of the president and governors, there was given to the latter the authority " to appoint the prefects, to approve the appointment of the sub-prefects of the department, to confirm that of the justices of the peace, and to remove any of these officials." Reynolds, 205.

By the law of March 20, 1837, for regulating provisionally the interior governments of the departments, it is provided, by article one, that " the interior government of the departments shall be in charge of the governors, departmental councils, (juntas,) prefects, sub-prefects, common councils, alcaldes and justices of the peace "; that it shall be the duty of the governors to appoint the prefects, etc. The power of the prefects is thus defined : Article 77 : " They shall regulate administratively and in conformity with the laws, the distribution of the common lands (tierras comunes), in the towns of the district, provided there is no litigation pending with regard to them, the right being reserved to the parties in interest to apply to the governor, who, without further appeal, shall decide what is most proper, with the concurrence of the departmental council (junta)." Reynolds, 221. This is the only act to which our attention is called which defines their functions.

It is difficult to say exactly what is meant by the power " to regulate administratively " the distribution of the common lands in the towns of the district. But it would not seem to include the power to make grants of public lands generally, though it might have justified in this case the special allotment (*hijuela*) to Vicente Samora, had it been made by the prefect. The power given to the governor to

make grants of public lands, which was expressly given by the regulations of November 21, 1828, (though the constitutional decrees of 1836 and 1837 were silent upon the subject,) taken in connection with the limited powers conferred upon the prefects by the law of March 20, 1837, apparently preclude the idea that the more general power of granting public lands was intended to be conferred upon the latter — in other words, the limited authority conferred upon them by Article 77 repels the inference of more extensive powers which had theretofore been vested in the governors, and in the governors alone.

Plaintiffs' counsel offered to show in this connection that other grants had been made by prefects, which had been recognized and confirmed by the proper Mexican authorities, and that several such grants had been confirmed by the Congress of the United States; but they were not regarded by the court below as sufficient to establish a general custom to recognize grants made by prefects as valid and legal. Indeed, the power given to prefects to regulate administratively the distribution of the common lands would seem to presuppose a prior grant to the pueblo, made by a higher authority, and to have been intended merely to authorize the prefect to make distribution of such common lands among the inhabitants of the pueblo.

The only case we have been able to find in which the power of prefects to make grants of public lands is discussed is that of *Ohm* v. *San Francisco*, 92 California, 437. In that case the complaint alleged that the State of California was, prior to July 13, 1848, a political department of the Republic of Mexico, and was subdivided into pueblos, constituting political municipalities, supplied with such officials as the republic or governor chose to appoint; that such officers could grant and distribute lands of the municipalities; that the pueblo of Yerba Buena, or San Francisco, was one of such municipalities, and was provided with a prefect appointed by the Republic and the governor of California, who was empowered, among other things, to make a grant and distribution of lands to private persons in fee within his district and said municipality. It seems that the grant in this case had been

approved by the governor of the department by virtue of his superior power to grant vacant lots within the boundaries of the Republic, and had been subsequently confirmed by the District Court.

The rarity of the question involved, and the special familiarity of the Supreme Court of California with Spanish and Mexican land grants, will justify a somewhat lengthy transcription from its opinion concerning the power of prefects: " We cannot find," said the court on page 451, " in any of the laws or ordinances of Spain and Mexico to which we have been referred any authority conferred upon prefects to make grants in fee of the pueblo lands. It is not contained in the decree of the Spanish Cortes of January 4, 1813, nor in the plan of Pitic, nor in the Mexican law of colonization of 1824, nor in the regulations of 1828, nor, we think, in the law of March 20, 1837, to which the prefect himself refers as the source of his authority. The clause of this act, cited and relied on by the appellant, is given in the original Spanish and in translation, at page 314, addenda, Dwinelle's Colonial History of San Francisco. In terms, it merely authorizes the prefects in their respective districts to ' regulate executively ' the distribution of the *common* lands of the pueblos, provided there are no law suits pending in the courts concerning them, saving a right of appeal to the governor. The law writers do not agree in their construction of this article. Dwinelle thinks it conferred authority to make grants of the pueblo lands for the pueblo. Halleck thinks that it merely conferred a power to regulate the temporary use of the common lands. This court has decided that it did not expressly confer power to grant lands in private ownership. *Hart* v. *Burnett,* 15 Cal. 572. As a matter of history it is known that the prefects very rarely attempted to exercise such power, not more than two or three instances, including this grant to Scherrebeck, appearing in the records of San Francisco, and one of those subsequent to the conquest, by Horace Hawes. It is also well known as a fact and as matter of law that the claim of such power by the prefects has been repudiated by the city from the beginning. The complaint here shows that the validity

-of this Scherrebeck grant was denied by the city as early as 1853, and ever since. The Van Ness ordinance passed in 1855, and ratified by the legislature in 1858, practically confirmed all previous grants of pueblo lands made by any ayuntamiento, town council, alcalde or justice of the peace of the former pueblo, or of the city, but was entirely silent as to grants by prefects. Even the allegations of the complaint do not show that the prefect had power as agent and acting in behalf of the pueblo to alienate its lands in fee. He is said to have authority to make grants and distribution of lands within the pueblo limits, but this power may have been derived from the departmental authorities and exercised independently and against the will of the municipal authorities. And this appears to have been the case with the Scherrebeck claim ; the making of the grant was opposed by the alcalde, the only municipal officer who appears to have had anything to do with it, but it was approved by the governor and the superior authorities."

In the case under consideration there was no evidence that the grant of the prefect ever received the sanction or approval of the governor, the *ayuntamiento*, (town council,) or other superior authority of the Mexican Republic ; and we do not think the fact that similar grants may have been confirmed by Congress, or received the approval of the Mexican authorities, is decisive in favor of recognizing its validity. In its adjudication of these cases, the Court of Private Land Claims is subject to certain statutory restrictions upon which previous confirmations by Congress of imperfect grants have no proper bearing. *Rio Arriba Co.* v. *United States*, 167 U. S. 298, 308. We are of opinion that it was beyond the power of the prefect to make the grant in question.

Nor do we think that petitioners are entitled to this grant by prescription or adverse possession, since under section thirteen of the act creating the Court of Private Land Claims; the title to the land must have been " lawfully and regularly derived from the government of Spain or Mexico," and one which, if not complete and perfect at the date of the acquisition of the property by the United States, " the claimant

would have had a lawful right to make perfect had the territory not been acquired by the United States." This would preclude the idea that possession since the date of the treaty, however exclusive and notorious, could be regarded as an element going to make up a perfect title. There was no evidence of more than six or eight years' possession prior to the date of the treaty, and this, under any construction of the Spanish or Mexican laws, would be insufficient to constitute a title as against the sovereign. Indeed, it may be open to doubt whether under the legislation of Mexico public lands are not imprescriptible; but if it be otherwise, it would seem that under the decree of the King of Spain of July 16, 1819, nothing less than a possession of forty years could be deemed or respected as creating title by adverse possession. 2 White's New Recopilacion, 562.

The disposition we have made of this case renders it unnecessary to consider whether the document offered in evidence to establish the plaintiffs' title, which was neither the *expediente*, nor the *testimonio*, or official copy thereof — and was merely an unsworn and unverified copy of the *testimonio* — was admissible at all.

If there be any hardship to the petitioners in the rejection of this grant, they must apply for relief to another department of the Government. We are bound by the language of the act creating the Court of Private Land Claims. Its decree in this case was correct, and it is therefore

*Affirmed.*