A. N. DAUCHY AND OTHERS v. J. W. DEVILBISS AND
OTHERS.

1. Articles of agreement between vendor and vendee of land recited that part
of the purchase-money was paid in cash, and stipulated that the balance
should be paid " on the thirtieth day after the termination of a suit to
" be instituted in the district, wherein the title to the land is to be in-
" volved, provided the suit shall terminate in favor of " the vendor's
title—and in the latter event the vendor, on receipt of the balance, should
make title to the vendee, who in the meantime should have possession
and enjoyment of the land. Soon thereafter, a suit for the land was
brought against the vendor and the vendee, and terminated in their favor ;
but, within one year from its termination, a second suit was brought by
the same adverse claimants. *Held,* that the above quoted clause of the
agreement must be understood to relate to the final establishment of the
vendor's title by the contemplated litigation ; and as, under our statute,
the adverse claimants were entitled to their second suit, the time limited
in the agreement for the payment of the balance must be understood
as the thirtieth day after the termination of this second suit, and not
after the conclusion of the first suit, by which the final establishment
of the vendor's title could not be accomplished.
2. Husband and wife covenanted, on payment of certain money, to " execute
" a proper conveyance for the conveying and assuring the fee simple "
of certain land belonging to the wife. Subsequently, the husband hav-
ing died and his widow married again, she, without the concurrence of
her second husband and without privy examination, made a power of
attorney, purporting to authorize her attorney to demand the money and
make title on its being paid. *Held,* that the power of attorney being
insufficient to enable the attorney to convey the married woman's title,
he could not, by any demand of the money, put the vendee in de-
fault.

APPEAL from Guadalupe. Tried below before the Hon. J.
J. Thornton.

This case is the latest development of that protracted litiga-
tion, which first cropped out in Jones *v.* Garza, 11 Texas, 186,
and re-appeared in Jones *v.* Muisbach, 26 Texas, 235. Those
cases and the opinion in the present case disclose all facts of
materiality.

*S. G. Newton,* for the appellants. The first question to determine is, what is the construction to be given the contract between Garza and Prince Solms, of 14th of March, 1845? Was it a contract requiring concurrent acts of the parties to it, or was the vendor only required to act after the vendee had offered performance? The language that after the happening of a certain event, " the said Rafael C. Garza and Maria " Antonia Veramendi Garza, his wife, shall and will, on and " after the 30th day "   *   *   *   " on receiving from " the said Prince Charles of Solms, as aforesaid, the sum of " six hundred and eleven dollars, being the balance of the " considerations aforementioned," etc., and " the said Prince " Charles of Solms as aforesaid shall and will, on the said 30th " day," etc., seems to me to indicate and determine that the vendors were under no obligations to make and tender title unless the vendee offered payment. Vendors certainly could not be required to be at the expense and labor of making title, and hunting up the vendee to tender a title, until they knew it would be accepted by the payment of balance of purchase-money. It is not pretended that the money was offered at the time, or at all, until after suit was brought, and until after notice that vendors intended to repudiate the contract; and not then by the vendee in the original contract, but by parties who were strangers to the contract, and who did not put themselves in place of the original vendee, nor could they so have done.

If I am correct in this position, the vendee can only escape the consequences of his failure by showing that the vendor was not in a situation to make the title if called upon. Or if by making a tender the vendee could have placed himself in a position to enforce, through the courts, a title from vendors, and did not do so, it was an abandonment or repudiation of the contract by him, or he must at least bring himself within some rule of law, excusing him from making the tender; then, *a priori,* the tender not being made, and no excuse given for not making it, the vendors had the right to consider the con-

tract abandoned by the vendee, and so treat or repudiate it themselves, or seek their remedy through the courts.

But suppose I am wrong in this conclusion, the case for plaintiffs is but strengthened, because it is averred and proved that the company was at the time insolvent, dissolved, and unrepresented, and this released plaintiffs from all obligations to tender title. (Haldeman *v.* Chambers, 19 Texas, 1; Perry *v.* Rice, 10 Texas, 367; De Cordova *v.* Smith, 9 Texas, 129; 2 Parsons, Contracts, pp. 678, 666; 3 Id., p. 408; 4 Wend., 285; 14 Ves. 556.)

The vendors, however, went further in this case. Knowing that the German Emigration Company had become insolvent, dissolved, and had ceased to be represented, and knowing, so far as it was concerned, it had abandoned its contract, gave the occupants of the land notice of the defect in their title, and offered a title to whoever would receive it, and pay the balance of the purchase-money. In this everything was done for the benefit of the holders under the company that could have been asked, and more than the law required. (Browning *v.* Estes, 3 Texas, 463, and 11 Texas, 246; Secrest *v.* Jones, 21 Texas, 121; Von Roeder *v.* Robson, 20 Texas, 754; Edwards *v.* Atkinson, 14 Texas, 373; Story, Eq. Jur., Section 771 *et seq.*)

It will also be borne in mind that the contract does not provide for the assigns of the company to be subrogated to their rights. Therefore the vendors were in no way bound to look to them for the payment of the purchase-money, nor could they have forced them to pay it, had they so elected, instead of bringing this suit. There was no privity or mutuality of contract between them, and no mutuality or reciprocity of obligation. The defendants owed plaintiffs nothing.

If there could have been a judgment against the land, the title could not have been forced upon the defendants. If the land did not bring sufficient to pay the judgment, plaintiffs could go no further. They would have had to lose the balance.

Then, if plaintiffs could not have forced defendants to pay

upon tendering title, no more can defendants force plaintiffs to convey, by tendering their portion of the purchase-money, or even a tender of all of it, on the trial of this cause. They are strangers to each other in contract as well as in equity. It was not the contract, or any part of the contract, between the original parties, and of this defendants had full notice. It was their business to look to their title, and if they had done so, they would have found that their grantor had no title in himself. The records of either Comal or Bexar county would have afforded them ample information. Nor can they complain or excuse themselves on account of ignorance, for the law does not admit such an excuse; and besides, the plea comes from them with a very ill grace, when we find they were so prompt in having their own titles recorded when they obtained them. They are estopped, and cannot take advantage of their own neglect or want of care. They could not speculate on the increase in the value of the property. (Edwards v. Atkinson, 14 Texas, 373.)

Let me ask the question, are the defendants, under the facts in this case, in any better position to demand title of plaintiffs than the German Emigration Company? I apprehend the answer would be no!

Then, had the company, at the institution of this suit, placed itself in a position to demand or enforce a title, or has it done so since? My understanding of the record is that they have not, and, if not, no one can assume to do it for them. That the party claiming must affirmatively show a right, is the general rule, and is applicable here.

See authorities before cited.

But the defendants seek to escape the consequences of the failure to pay, by making tender after default. I cannot see that they have brought themselves within any rule upon the subject.

As before said, they are strangers in contract to the vendors and plaintiffs. They show no authority to demand title for the whole, either to themselves or any others in privity with

them. The vendors or plaintiffs were only bound to Prince Solms, his heirs, executors, or administrators, or, if such a thing could be, to the heirs, executors, or representatives of the German Emigration Company. Prince Solms is not dead. The company has long been so, and left none to represent it.

Had defendants, and those similarly situated, been diligent, they might have found and had relief, by applying to a proper court for the appointment of a commissioner or other proper officer to act in their behalf, and make payment, and receive a title for their use and benefit. To undertake to obtain a decree of title in this suit, or any decree equivalent to it, is to me something new, and, I think, without precedent. (Smith v. Dickinson, 6 Humph., 261.)

The fact that the company was insolvent and unrepresented long before the maturity of the contract, and has continued so ever since, is conclusive in favor of plaintiffs, and against those who were the company, and, as a consequence, against all claiming under them.

It is claimed that this suit was prematurely brought. That there was another suit pending in Gonzales county District Court, brought by the same plaintiffs. But to concede this for the sake of the argument, we will find that the company, by its insolvency, removal from the country, and dissolution, had placed itself in a position so it could not perform its contract. And hence the right of plaintiffs to treat it as abandoned. (3 Parsons on Contracts, 408.)

It was also a grave error in the court to instruct the jury that the power of attorney to Paschal was a nullity, because the power of attorney was admitted in evidence without objection. Nor was it an objection made by the parties to whom the deed was tendered. And it will be further observed, from Paschal's testimony, that he offered to make the deed upon payment of balance due, or to refund what had already been paid; but they would do neither. (Fullerton v. Doyle, 18 Texas, 3.)

7

And if it was otherwise, still the instruction was wrong, because Mrs. Sierra was only undertaking to do voluntarily what she might have been compelled to do by law, if the defendants were in the right. It was the effort to discharge a personal duty and obligation, in which the husband was not interested, and for which he was not liable. It was not one of the cases of contract which the wife is incompetent by law to make without the consent of the husband. Suppose he, from captiousness or otherwise, had refused to join her when requested, was she to be mulcted into the costs of a suit, when she was ready and willing to do all she could for the interest of both parties ? And besides, it may be he was absent, and she was acting for herself. If so, our law holds her bound by her acts. That nothing was to be apprehended from him is clear, from the fact that no such objection was made when the deed was tendered, and from the fact that he now joins her in this suit. (See Womack v. Womack, 8 Texas, 397.)

‘If the court was correct in this, all evidence of the tenders to Mrs. Sierra should have been excluded, and the jury so instructed, for in no instance was the husband present when the tenders were made, nor were they made to him with the wife.

It was further error in the court to instruct the jury that the tenders made to counsel were sufficient, unless they at the time disclaimed their authority. The proposition is true when the acceptance of money completes the transaction, but not true when a covenant, deed, or other solemn instrument is to be executed to complete the transaction ; for no presumption exists in favor of an attorney engaged in prosecuting a suit having such authority, and none particularly in this suit, where the sole object is to avoid the acceptance of the money, and to regain the title and reclaim the possession of the land. Neither the payment into court at the trial, nor any of the former tenders, can avail the defendants, or satisfy the contract, because the parties making the tenders show no authority to make the tender and receive the title on behalf of or as assignees of the German Emigration Company or Prince

Charles. (Washington v. Johnson, 7 Humph., 468 ; Poindex-
ter v. Vernon, 9 Humph., 84.)

*John P. White*, for the appellees. It is believed that the
leading questions arising upon the facts in this case are :

*First.* Was time of the essence of the contract of 14th of
March, 1845 ?

*Second.* When did the time expire ?

*Third.* Did the expiration of the time, under the circum-
stances of the case, operate as a waiver of the time or a for-
feiture of the contract ?

*Fourth.* If the contract was subsisting, was there such priv-
ity existing between defendants and the original contracting
parties, as would entitle the defendants to judgment and
decree for a specific performance.

I. " Time is not generally deemed in equity to be of the
" essence of the contract, unless the parties have expressly so
" treated it, or it necessarily follows from the nature and cir
" cumstances of the contract. It is true that courts of equity
" have regard to time, so far as it respects the good faith and
" diligence of the parties." (2 Story's Equity, Section 776.) It
is equally true, " that if the parties choose even arbitrarily,
" provided both of them intend to do so, to stipulate for a
" particular thing to be done at a particular time, the stipula-
" tion must be carried literally into effect in a court of equity.
" This is the real contract ; the parties had a right to make
" it ; why should the court interfere to make a new contract,
" which the parties have not made." (Edwards v. Atkinson,
14 Texas, 373 ; Sug. on Vendors, 359, 360, 361.) " And where
" such intention appears from the terms or other circum-
" stances, it cannot be disregarded by courts, and other time
" or terms substituted." (1 Johns. Chan., 370, 375 ; 4 Johns.
Chan., 559 ; 5 Johns. Chan., 184 and 194.)

II. The Prince Charles was to pay the six hundred and
eleven dollars on the " thirtieth day " after the " termination
of said suit." " Termination," according to the definition of

Webster, means " the end, conclusion, result, last purpose."
In other words, the stipulations in the contract for the pay-
ment of this money by the German Emigration Company,
were, that when all the questions pertaining to the title
between the conflicting rights of Bastrop and Veramendi were
settled beyond additional controversy, and settled in favor of
the Veramendi title, the six hundred and eleven dollars were
to be paid on the thirtieth day from and after that settlement,
decision, or termination.

The suit of Jones v. Garza, brought in the District Court
of Bexar county, was decided on the 10th day of July, 1846.
Was that such a " termination " as was contemplated by the
parties at the date of the execution of the contract ? We
doubt very much if it will be so contended. The judgment
in that case-was affirmed by the Supreme Court, on the 20th
of December, 1853. Was this affirmance the end, conclusion,
and termination of the suit ? The law does not justify such a
position. The suit was an action of " Trespass to try Title,"
though the petition was not so indorsed. (Allen v. Stepha-
nus, 18 Texas, 658 ; Dangerfield v. Paschal, 20 Texas, 536.)

Where A sold a tract of land to B, and stipulated, by his
bond, to prosecute to effect a suit then pending in the District
Court between himself and C, for the land, to perfect, and
thereafter make B a *bona fide* title ; and the latter was bound
to pay the former the purchase-money on the first Christmas
after the decision of the suit, with interest, from the date of
the judgment ; it was held, that the recovery of a judgment
by A against C in the District Court, from which the latter
appealed, did not perfect A's title, and was not a prosecution
of the suit to effect. An action would not lie against B
during the pendency of the appeal. (Callison v. Gray, 25
Texas, 84.) " If the intent of the parties is clear from the
" instrument to secure B a good title, by the prosecution of
" the suit to effect, A is required to obtain such decree before
" a right exists to demand the money, although it might be
" obtained sooner or later, or in a different tribunal, than

" that which they supposed or spoke of, at the time of the
" contract." Ib.

The questions to be solved in construing this contract, are :

1st. Were the conditions concurrent ? or,

2d. Were the conditions dependent ?

It will be seen, that the learned judge presiding at the trial,
in his charge to the jury, held, that the conditions were con-
current. If this construction is correct, his charge fully covers
the law of the case, and the rule is most forcibly and con-
cisely stated by him as follows: " Concurrent promises are
" those where the acts to be performed are simultaneous, and
" either party may sue the other for a breach of the contract,
" or, by taking the proper steps, repudiate and rescind it
" altogether, by showing that he was ready and willing to do
" his act or perform his part of the contract at the proper
" time, and in the proper way, or that he was prevented from
" doing it, or being so ready to do it, by the act or default of
" the other contracting party. If, however, neither party
" performed his part of the contract, or has shown by the evi-
" dence that they were able, ready, and willing to perform
" their part of the contract at the time and in the manner
" stipulated in the contract for making the deed and paying
" the balance of the purchase-money, or that they were pre-
" vented from so doing, or being so ready, by the act or
" default of the other, then time ceased to be of the essence of
" the contract ; and before either party could be put in de-
" fault, one of them must first have offered to perform his
" part of the contract ; demanded performance on the part of
" the other party ; and before the party so offering to perform
" can then rescind the contract, the other party must have
" refused to perform or comply with the contract ; and if no
" such offer and refusal was ever made, then the contract
" remained in full force, and neither party can rescind it with-
" out the consent of the other."

In support of this charge we refer to the following authori-
ties : 2 Parsons on Cont., 189 ; Sug. on Vendors, 275 ; Law-

rence v. Dale, 3 Johns. Chan. Rep., 23; Benedict v. Lynch, 1 Johns. Chan. Rep., 373; Younger v. Welch, 22 Texas, 417; Mitchell v. Shephard, 13 Texas, 493; Scarborough v. Arrant, 25 Texas, 129; Green v. Chandler, 25 Texas, 148; and Farris v. Bennett's Executors, 26 Texas, 568.

The counsel of plaintiffs contend that the conditions of the contract are dependent, and that the payment of the money was a condition precedent to the execution of the deed. In argument on trial in the lower court, they cited and relied upon Taylor v. Johnston, 19 Texas, 351; Bridge v. Young, 9 Texas, 401, and Lawrence v. Simonton, 13 Texas, 381. Neither of these cases support the position assumed, but are authority directly against it. In the case of Taylor v. Johnston, the language of the bond was, that Johnston and Dewberry were to make the deed "whenever" Taylor paid the money. The language of the contract is, that " upon the execution of such conveyance " the money would be paid. The other two cases are similar to Taylor v. Johnston, and not analogous to the case at the bar.

If the covenants are dependent, then we reply that the stipulation for Garza and wife to execute the conveyance was a condition precedent to the payment of the money.

" In the case of contracts for the sale and purchase of real " estate, where the purchaser covenants to pay the purchase- " money by installments, and the vendor covenants to convey " by deed, either on the last day of payment or on some day pre- " vious; the covenants to pay, the installments falling due be- " fore the day appointed for conveying by deed, are independ- " ent of the covenant to convey; but the conveyance, or offer " to convey, is a condition precedent to the right to insist upon " the payment of an installment falling due either on or after " the day of conveyance." (5 Wend., 496: 1 Cush., 279; 1 Seld., 247; 6 Barb., 337; 1 Blackf., 172; 13 Pick., 281: 3 Stewart, 361; 2 Parsons on Cont., pp. 41, 42, and Note; 2 Parsons on Cont., 189; and we specially cite the court to the case of Burwell v. Jackson, New York Reports, 1855.)

Where the condition is precedent it must be strictly performed, in every particular, in order to entitle the party whose duty it was to perform it, to enforce the contract against the other party. (Story on Cont's, Section 32; 2 Pick., 155; 5 Pick., 395; 8 Cow., 457; 9 Mass., 78; see also Burwell v. Jackson, New York Reports, 1855.)

Whenever the time had expired, or, to speak more definitely, whenever the thirtieth day after the termination of the suit had arrived, if Garza and wife, or Mrs. Sierra, intended to hold the time as of the essence of the contract, it was her duty to make out and tender, on that day, a valid deed to the land before she demanded payment of the balance. "It is "not the duty of the vendee, in this country, to prepare and "tender the vendor a deed for execution; but it is the duty of "the vendor to have the deed prepared at his own expense, in "the absence of express stipulation." (Walling v. Kinnard, 10 Texas, 508.) In Berry v. Young, 2 Esp., N. P. C., Kenyon, C. J., said: "A seller of an estate ought to be prepared to "produce his title and deeds at the particular day." And again: "The vendor must be prepared to make out a good "title on the day when the purchase is to be completed." (1 Wheat. Selwyn, 178, 179; Sug. on Vend., 265, 266; 1 Peters, U. S., 455.)

"A contract to make a good title, means a good title both "in law and equity." (1 Wheat. Selwyn, 178, 179.)

III. Suppose, however, for the sake of argument, that the decision of the Supreme Court, on the 20th day of December, 1853, affirming Jones v. Garza, was the termination of the suit. Suppose that there had been no demand by plaintiffs, and no payment by defendants, and no steps taken by either party on the thirtieth day after that decision to complete the contract; would a court of equity necessarily consider the contract as totally annulled? Or would it not rather consider that the parties, by their acts, had waived the essentiality of the time?

The position assumed by appellants in this case is, that, upon the happening of the event the vendor has nothing

further to do ; that all further obligations rest upon the vendee, and him solely, and that unless he acts, and acts within the very letter of his contract, he thereby forfeits it entirely, and that he cannot and will not be allowed to show any fact or state of circumstances going to relieve him from this dilemma.

The rigid rules and unyielding forms of abstract law might so declare. But it is a principle equally as beneficial as it is well known and established, that equity does not permit the forms of law to be made the instruments of oppression, and will always interpose against parties attempting to avail themselves of the rigid rule of law for unconscientious purposes.

" For the doctrine of courts of equity is not forfeiture, but " compensation. Indeed, in some cases, courts of equity will " decree a specific execution not according to the letter of the " contract, if that will be unconscientious, but will modify it " according to the change of circumstances." (2 Story's Equity Juris., Section 775.)

" Even where time is of the essence of the contract, it may " be waived by proceeding in the purchase after the time has " elapsed." (2 Story's Equity Juris., Section 776.)

" The failure of one does not, even at law, put an end to the " contract so as to make it void. It gives the other party the " right to rescind or to waive the default, and continue it in " force. When this right, either of rescission or continuation " of the contract, has been exercised, then the rights of the par- " ties are resettled upon a new basis, into which such act enters " as an element." (Scarborough v. Arrant, 25 Texas, 129 : Edwards v. Atkinson, 14 Texas, 379; Primm v. Baxter, 18 Texas, 222; Walker v. Emerson, 20 Texas, 710; Farris v. Bennett, 26 Texas, 568.)

It follows then—

1st. If time was of the essence of the contract, then the plaintiff, Mrs. Sierra, waived and dispensed with it, for she did not, on the thirtieth day after the 20th day of December, 1853 (which plaintiffs say was the termination of the suit), demand the money.

2d. Mrs. Sierra waived the essentiality of the time, " by " proceeding in the purchase after the time had elapsed," for we find her demanding the payment under the contract, through her agent Paschal, eleven months after the time had elapsed.

3d. Mrs. Sierra, and the other plaintiffs in this case, waived the essentiality of the time " by proceeding in the " purchase after the time had elapsed;" because, when the second suit was brought by Jones v. Meusebach, these plaintiffs, after intervening in said suit, and setting up title in themselves, withdrew their plea in intervention at the spring term, 1855, of the District Court of Guadalupe county, and permitted these defendants to go on and defend that suit under the terms of the contract, and claiming title in themselves under the contract to a successful termination both in the District and Supreme Courts.

" The law is well settled that he who prevents or dispenses " with the performance of a condition cannot take advantage " of the non-performance." (Risinger v. Cheny, 2 Gillman, 84.)

There is another rule which we think may well be invoked against these plaintiffs: " A party wishing to rescind a con- " tract, must give notice, and the notice must be a legal one." (Younger v. Welch, 22 Texas, 418.; Green v. Chandler, 25 Texas, 148 : Scarborough v. Arrant, 25 Texas, 129.)

IV. But it is contended for plaintiffs that there is no privity of contract between defendants and Mrs. Sierra, and between defendants and Prince Charles and the German Emigration Company, and that therefore they have no right to set up and insist upon the contract, much less to ask and demand its performance in their behalf. It is said that defendants, holding, as they do, under a deed or deeds from the German Emigration Company, must look to the covenants in their deeds.

We reply that defendants are in possession under quit-claim deeds from the German Emigration Company; that a quit-claim deed is nothing more nor less than an assignment of such

interest as the vendor has.    The interest of the German·Emigration Company was derived from the contract, and any execution by them or their agents of a quit-claim deed to their interest was but an assignment of their rights in the contract, and gave to the vendee such rights as they possessed.

Furthermore, the contract itself stipulates that it was executed as' well for the contracting parties as for their heirs, executors, administrators, and assigns.

" A contract for the sale of land is not required by statute to·
" be under seal; and whether the agreement assume the form
" of a bond for title, or other form, is not material.    The
" interest which a vendee has under such a contract is assign-
" able."    (Holman v. Cresswell, 13 Texas, 38.)    And the assignee is entitled to his action for specific performance, or on the covenants, directly against the original vendor.    (Urquhart v. Ury, 27 Texas, 7.)

We are, however, here met by the objection that defendants in this suit, claiming only one lot (139) out of twelve hundred and sixty-five acres, cannot claim an assignment of the entire contract; nor, upon payment of the money, can they claim a specific performance of the entire contract, there being other parties, not parties to the suit, who claim interests in the contract by similar and different assignments.    In Durst v. Swift, the court says: " We do not consider the assignments less valid
" and effectual to vest title because made by separate deeds or
" instruments."    (11 Texas, 273.)

The contract being an entirety so far as plaintiffs were concerned, and its assignment being none the less valid that it was effected by different deeds, it follows that any one of the separate assignees, upon paying the full amount due, can claim its performance for himself and co-assignees. ◦ He could not claim the right to a full performance unless he tendered and paid the full amount due.    But, upon payment of the full amount, the contract, so far as the plaintiffs are concerned, is at an end and satisfied.    There may be a thousand sub-claimants or assignees, but the plaintiffs can only claim one full payment and satisfac-

tion, and the payment of the money by any one entitled to pay any portion, is the end not only of the contract but of the law also. Any further questions are not between plaintiffs and the party assignee paying, but between the payer and his co-assignees, and are questions with which plaintiffs have nothing to do. The law does not constitute them the agents or guardians of the rights of the other parties at interest.

If the German Emigration Company could have a decree for specific performance, then their assignees may have the same, for the rule is well settled " that in general, where the specific " execution of a contract will be decreed between the parties, " it will be decreed between all parties claiming under them in " privity of estate, or of representation, or of title, unless other " controlling equities are interposed." (2 Story's Equity Juris., Section 788.) " And if the vendee, under such a contract, con- " veys the same to a third person, the latter, upon paying the " purchase-money, may compel the vendor, and any person " claiming under him in privity, or as purchaser with notice, to " complete the contract and convey the titles to him." (2 Story's Equity Juris., Section 788; McCrady v. Brisbane, 1 Nott & McCord, 104; Bullion v. Campbell, 27 Texas, 653.)

V. Upon this question of privity there are two other points to be considered, viz.:

1st. By the contract, Prince Charles or the German Emigration Company was to have the possession of the premises, and receive and enjoy the profits thereof until the thirtieth day after the termination of said suit.

2d. The covenants for possession and for assurances of title by Garza and wife, were covenants which ran with the land.

Garza and wife having contracted to make title upon payment of the money, they cannot inquire, nor will they be heard to inquire into the rights or title of the party or parties in possession, especially when they, at the time of executing the contract, conveyed the right of the possession and the actual possession of the land. This question of possession or right to

possession and title, the money having been paid, is one which could only arise between Prince Charles, the German Emigration Company, and the parties in possession, and it is one with which plaintiffs have nothing to do, and in regard to which they cannot in any manner be made liable or responsible. Having parted with possession and the right to possession, plaintiffs have only to do with the parties they find in possession upon the accomplishment of the condition. Prince Charles was put into possession, and it was for him to hold or assign it; and whether he assigned it to one or many, or whether by warranty, quit-claim, or even by parol, is a matter of no consequence to plaintiffs, because the covenants ran with the land.

The covenants were in legal and technical parlance as well as in fact " attached to the estate." They were covenants both for the possession and title to the land up to the thirtieth day after the termination of the suit; and the party or parties in possession at that date were as much entitled to specific performance as were Prince Charles or the German Emigration Company. (Rawle on Covenants, pages 282, 3, 4, 288, 293, 300, 301, 307, 316. McCrady v. Brisbane, 1 Nott & McCord 104. 1 Smith's Leading Cases [Spencer's case] pages 108, 116, 135.) " If a grantor is in possession and conveys with covenants of " warranty, his covenant takes effect and runs with the land." Slater v. Rawson, 1 Metcalf 450.

" Agreeably to the principles of the common law, to pass to a " third person the right of action on the covenant, there must " in all cases have been a conveyance of some definite estate. " The covenant, by itself, whatever may have been its nature, " was necessarily incapable of assignment by deed or parol; " but if it were attached to an estate in land, any assignment " of the land took with it unavoidably the covenant. It fol- " lows as a consequence from this, that while, between the " original grantor and grantee of an estate, a covenant could " never be called into being without a deed, yet if it were capa- " ble of running with the land, any subsequent assignment of

" the estate, even by parol, carried with it to the assignee the
" right of suit on the covenant.  A deed, although necessary
" to create an estate, was unnecessary to transmit it."    (Smith's
Leading Cases [Spencer's case] page 120.)

And again: " The court (in Beardsley v. Knight, 4 Verm.
" 471) would seem to have thought that when a party wished
" to take advantage of covenants created by deed as running
" with the land under a subsequent conveyance to himself, he
" must show that such conveyance was by deed.   This opinion
" seems to be altogether unfounded, since at common law cove-
" nants, although requiring a deed to call them into being in
" the first instance, ran with the subsequent conveyance of the
" land when made by a parol assignment of a chattel interest
" therein, or a feoffment of a freehold without deed."    (Smith's
Leading Cases, pages 124, 137 ;  see also, on this point, Bullion
v. Campbell, 27 Texas, 653.)


WALKER, J.    The historical minuteness of the very able
briefs filed in this case renders it unnecessary that we should
recapitulate the facts which led to the making of the contract
out of which this suit has grown, though they may be dwelt
upon with interest by the future historian of Texas.

The contract is as follows :

" THE REPUBLIC OF TEXAS,
        "*Bis Partiti.*

"Articles of agreement made and entered into, this, the 14th
" day of March, A. D. one thousand eight hundred and forty-
" five (1845), between Rafael.C. Garza and Maria Antonia Vera-
" mendi Garza, his wife, of the county of Bexar, in the Repub-
" lic aforesaid, of the one part, and Prince Charles of Solms
" Braunfels, as Trustee of the Association for the Protection of
" Emigrants in Texas, of the other part, as follows :

" The said Rafael C. Garza and Ma. Antonia Veramendi
" Garza, his wife, do hereby covenant, promise, and agree with
" the said Prince Charles of Solms as aforesaid, to sell, assign,

"grant and surrender unto him, as trustee as aforesaid, all the
"existing right, title, and interest of inheritance that the said
"Ma. Antonia Veramendi Garza has as heir at law of the
"estate of her deceased father and brother, both named Juan
"Martin Veramendi, in and to all that certain tract of land
"consisting of two leagues, more or less, situated, lying, and
"being within the county of Bexar, on the southwestern mar-
"gin of the waters of the Guadalupe river, and known as the
"Comal tract, the same being more particularly designated and
"described by the plot, boundaries, and description hereunto
"annexed, signed by the parties hereto, and made a part of this
"agreement—the said right, title, and interest of inheritance
"in said Comal tract, herein covenanted to be conveyed, is not
"to exceed one equal undivided fourth part of said tract—for
"the sum of one thousand one hundred and eleven dollars; five
"hundred dollars of which sum is to them, the said Rafael C.
"Garza and Ma. Antonia Veramendi Garza, his wife, in hand
"paid by the said Prince Charles of Solms, as aforesaid, at the
"sealing of these presents; and for the further consideration and
"upon the conditions hereinafter expressed, and that they, the
"said Rafael C. Garza and Ma. Antonia Veramendi Garza, his
"wife, shall and will, on the thirtieth day from and after the
"termination of a certain suit to be instituted in the District
"Court of said county, wherein the title to said tract of land
"is involved, provided the said suit, so to be instituted, shall
"terminate in favor of the said parties of the first part, on
"receiving from the said Prince Charles of Solms, as aforesaid,
"the sum of six hundred and eleven dollars, being the balance
"of the considerations aforementioned, and upon the said party
"of the second part paying the entire costs of counsel or coun-
"sels employed or to be employed by the said party of the
"first part, at his own cost and expense, execute a proper con-
"veyance for the conveying and assuring the fee simple of the
"said premises to the said Prince Charles of Solms, as aforesaid,
"free from all encumbrances; which conveyance shall contain
"a general warranty and the usual full covenants.

" And the said Prince Charles of Solms Braunfels, as afore-
" said, agrees with the said Rafael C. Garza and Ma. Antonia
" Veramendi Garza, his wife, that the said Prince Charles of
" Solms, as aforesaid, shall and will, on the said thirtieth day
" from and after the termination of the said certain suit to be
" instituted in the said District Court of said county, wherein
" the title to the said tract of land is involved, provided the
" said suit so to be instituted should terminate in favor of
" the said parties of the first part, and on the execution of
" such conveyance, pay unto the said Rafael C. Garza and
" Ma. Antonia Veramendi Garza, his wife, the sum of six hun-
" dred and eleven dollars, being the balance of the considera-
" tion, and the entire costs of counsel or counsels, employed or
" to be employed by the said party of the first part afore-
" said.

" And it is further agreed between the parties aforesaid as
" follows :

" The said Prince Charles of Solms Braunfels, as aforesaid,
" shall have the possession of the right, title, and interest of
" inheritance in the said two leagues tract herein covenanted
" to be conveyed, which is not to exceed one equal one-fourth
" part of said Comal tract, so soon as the same shall be set
" apart, divided, and the divisional lines thereof run by the
" Commissioners who have been appointed by the probate
" court of said county, to divide the estate aforesaid, between
" the lawful heirs of the same, and receive and be entitled to
" the profits thereof, until the said thirtieth day from and after
" the termination of the suit to be instituted as aforesaid, the
" party of the second part paying the taxes that hereafter ac-
" crue on the said premises herein agreed to be conveyed.

" And it is further agreed between the parties aforesaid, that
" should the suit to be instituted as aforesaid prove unsuccess-
" ful by the party of the first part, then, and in that case, the
" party of the second party agrees with the party of the first
" part to pay a moiety or equal half part of the fee or fees
" of the counsel or counsels employed by the party of the first

" part, as well as the costs of the court accruing on said suit
" to be instituted as aforesaid.

" And it is understood that the stipulations aforesaid are to
" apply to and to bind the heirs, executors, and administrators
" of the respective parties to these presents, and that no error
" or misstatement in the description of the premises herein
" covenanted to be conveyed, shall vitiate this agreement.

" And for the faithful performance of all and singular the
" covenants, conditions, and agreements herein contained, the
" parties to these presents, for themselves and for each of their
" heirs, executors, administrators, and assigns, bind themselves
" each to the other firmly, by these presents.

" In testimony whereof, the parties of these presents have
" hereunto set their hands and seals.  Done in duplicate or
" *bis partiti*, at the city of San Antonio, on the day and date
" first above written.

" RAFAEL C. GARZA,               ·      [Seal.]
" MARIA A. VERAMENDI GARZA,      [Seal.]
" CHARLES, PRINCE OF SOLMS,      [Seal.]

" Signed, sealed, and delivered in the presence of the un-
" dersigned witnesses :

" THOMAS J. DEVINE.
" AMBROSIO RODRIGUES."

Charles, Prince of Solms, in making this contract, acted as
trustee of the " Association for the protection of German Emi-
" grants in Texas," to which position he had been chosen in the
year 1844.   The terms of the contract plainly indicate the ob-
ject and purpose for which the land was purchased, and the
transfer of possession under the contract of sale.   We are in-
formed from the contract that the contracting parties were
alike aware of a cloud upon the title of Garza and wife, and the
final execution of the contract was made to depend upon the
removal of this cloud.

About the year 1807, Baron de Bastrop obtained from the
Viceroyalty of Spain a concession of four leagues of land

bounding on the Guadalupe river, and embracing the land on which the city of New Braunfels is built, as well as Lot No. 139, now in controversy. To perfect the title it appears to have been necessary that the Spanish Intendante at San Louis Potosi should confirm the same. This latter step does not appear to have been perfectly complied with. The concession was presented to the Primero Vocal of the illustrious deputation of Texas, acting as political chief, and was confirmed, and possession given.

Twenty years afterwards, or about the year 1827, Juan Martin Veramendi purchased from the Mexican government a grant of two leagues of the land covered by the Bastrop concession. Thus it will be seen these titles came into serious conflict.

In the year 1839 Baron de Bastrop died, and the four leagues of land covered by the concession of 1807 were sold by his administrator to John S. Simpson, who re-sold the land to Enoch Jones and J. W. Smith.

Juan Martin Veramendi, senior, and his son of the same name, having also deceased, Mrs. Maria Antonia Veramendi Garza, who was the daughter of Juan Martin Veramendi, senior, had intermarried with Rafael C. Garza, and had inherited from her father and brother the lands described in the contract of March 14th, 1845.

Upon the statement of these facts it will be seen for what reason a suit was apprehended for the settlement of this title. By the law of Texas as it stood at the time this contract was entered into, some light may be thrown upon the contract, as well as a rule furnished for its interpretation. Article 5298, Paschal's Digest, provides that, " in all actions of trespass to try " titles to lands, commenced within the time limited by law, " the plaintiff should proceed with all convenient expedition to " the trial of the same; and in case a verdict and judgment shall " pass against him in such action, such verdict and judgment " shall not be conclusive and definite against the plaintiff, but " at any time within one year the said plaintiff, or any other

8

" person claiming under him, shall have a right to commence " his action for the recovery of said lands *de novo*, and prose- " cute the same in the manner and with the expedition before " directed; but, in case a verdict and judgment again pass " against such plaintiff, then such second verdict and judgment " shall be finally conclusive on the part of every such plaintiff, " and he shall be forever barred and excluded from any further " action or suit for the recovery of the same lands, and the right " of the defendant shall be thenceforth finally settled and estab- " lished against such plaintiff, his heirs and assigns." * * *

Notice must here be taken of the pleadings and deraignment of title in this suit. It is an action of trespass to try title. The appellants brought their suits against the appellees, to recover possession of Lot No. 139 in the city of New Braunfels. The action was commenced on the 17th day of April, 1858. The defendants plead not guilty to the trespass, with a general denial. The venue was changed from Comal to Guadalupe county.

George Benfer, the original grantee of the German Emigration Company, was made a defendant. Julius Voelker, Benfer's administrator, was afterwards made a party. Both Benfer and Voelker answered, specially setting up a title under the contract of March 14th, 1845, and prayed for a specific performance of the same. They also plead several acts of tender.

On the 7th of September, 1869, one Christopher Tolle intetervened; adopted the pleadings of his co-defendants, and pleading further acts of tender.

On the 9th November, 1869, the defendants amended their pleadings, averred a payment of the money, principal and interest, due under the contract of the 14th of March, 1845, and prayed specific performance.

On the following day the plaintiffs excepted to the intervention of Tolle, and also to the amended answers of the defendants; which was sustained as to Tolle's intervention, and overruled as to the amended answers. The last amended answer, filed on the 11th of November, 1869, asserts the right

of Benfer to the lot in controversy, as an emigrant member of the German Emigration Company.

On the trial the verdict and judgment were for the defendants; a motion for a new trial was overruled, and an appeal taken to this court.

Some portion of the very interesting history of these German colonists, from whose settlement the beautiful and prosperous towns of New Braunfels and Fredericksburg have sprung, must here be introduced.

In the month of September, 1843, Henry Fisher and Burchard Miller concluded a contract with the Republic of Texas, for the colonization of six thousand emigrants on the waters of the Llano and San Saba. The Association for the Protection of German Emigrants in Texas was organized, as is said in the briefs, by a company of princes, noblemen, and gentlemen in the dukedom of Nassau in Germany, in the month of May, 1843. In June, 1844, Fisher and Miller assigned their contract with the Republic of Texas to the German Emigration Company; and it appears to have been the original plan of the company to have supplied the emigrants with land in the Fisher and Miller colony.

Three ship-loads of emigrants landed upon the coast of Texas in the close of the year 1844. At this time Prince Charles of Solms Braunfels was the trustee of the Emigration Company. He came to Texas in advance of the emigrants, for the purpose of making the necessary arrangments for their settlement and temporary subsistence. Finding the lands upon the Llano and San Saba far removed from white settlements, overrun by hostile tribes of Indians, and too far removed from any base of supplies to render their colonization practicable, he determined upon other locations for his colonists; and in pursuance of this change of the original plan, he located his first colony at Indianola, on Matagorda Bay, his second at New Braunfels, and his third at Fredericksburg. George Benfer was one of the colonists who was expected to settle on the Fisher and Miller grant; but, owing to the

reasons already stated, his destination was changed to New Braunfels. Immediately after the purchase of the Comal tract from Garza and wife, Prince Charles of Solms laid off the lands, or a portion thereof, into building and farm lots ; these were distributed to the colonists by an allotment, and Benfer drew the lot No. 139, now in controversy. Thus it will be seen how he came in possession of the lot, and what privity of title there is between the present defendants and Prince Charles of Solms ; and with what right and propriety the appellees defend their title under the contract of March 14th, 1845.

On the 10th day of July, 1846, Enoch Jones and others, claiming title under the Bastrop concession, filed their suit in the District Court of Bexar county against Rafael C. Garza and others claiming title under the Veramendi grant of 1827. At this time John O. Meusebach was the trustee of the German Emigration Company, and was made defendant in the action as such, and defended under the contract of March 14th, 1845. Garza in his answer claimed title to the land not embraced in the contract with Prince Charles. This suit was decided on the 14th day of December, 1847, in favor of the defendants. The plaintiffs took an appeal to the Supreme Court, and on the 20th of December, 1853, this court affirmed the judgment of the District Court. (11 Texas, 186.) On the 23d of January, 1854, the mandate was filed in the office of the district clerk.

It now becomes necessary to notice that Rafael C. Garza had died before the affirmance of the judgment in the Supreme Court, and his widow had intermarried with Antonio Sierra.

It is contended on the part of the appellant that Prince Charles of Solms and those who claim in privity with him were in default after the expiration of thirty days from the affirmance by the Supreme Court of the judgment in Jones et al v. Garza et al. Whether time was of the essence of this contract, we will hereafter present our opinion. But it appears

from the record that no effort was made to put Prince Charles and those claiming under him in default, for near eleven months after the action of the Supreme Court. But, on the 14th day of November, 1854, the now Mrs. Sierra, without the concurrence in the instrument of her husband, Antonio Sierra, made her separate power of attorney to I. A. Paschal, authorizing and empowering him to receive and receipt for the money due her under the contract of March 14th, 1845, and upon the receipt of the money to execute in her name a deed to the land, and, in case of refusal, to tender back the five hundred dollars originally paid by Prince Charles, together with interest; and under the authority of this power, the attorney, Judge Paschal, in his evidence states that he made a demand of the money upon the Mayor of New Braunfels, also upon M. A. Dooley, the attorney of the German Emigration Company, and also upon H. Fisher, the reputed agent of the company, and that he was refused the money by each of these persons.

We may here remark, though we do not consider this as material to the decision of the case at bar, that under the power of attorney, as found in the record, Judge Paschal could not have made such a deed as the contract of March 14th, 1845, calls for. The statute pointed out the way, and the only way, in which the wife could convey her separate property. The husband of Mrs. Sierra did not join her in the execution of the power; there was no privy examination of the wife, nor were there even witnesses to her execution of the power. Whether the husband, by virtue of his marriage, acquired any interest in his wife's lands, or not, is a matter totally immaterial; the power was wholly insufficient to enable the attorney to make a good deed for the wife's land, and no act of the attorney under this power could place Prince Charles, or those claiming in privity with him, in default. But we regard this branch of the case as one entirely subordinate to that upon which we shall now proceed to remark.

By the terms of the contract between Prince Charles and

Garza and wife, its final execution was deferred until the thirtieth day after the termination of a suit which was to settle the controversy between those claiming under the Bastrop concession, and those claiming under the Veramendi grant. This, in our view, was clearly the meaning and intention of the contracting parties.

But our law, as already quoted, shows clearly that a controversy of this kind could not be determined in one suit. The law provides that before a plaintiff shall be bound to give up his claim of title to land in controversy, he is entitled to a second suit; and as all parts of the contract, taken together, convince us beyond a doubt that it was the intention of the parties that this controversy should be ended before the balance of purchase-money should be paid or a deed demanded, we have no hesitation in saying, from the facts in the case as well as the law, that there never has been a default on the part of Prince Charles, or those claiming in privity title under him.

Let us look to some of the leading facts. On the 28th of November, 1854, or just two weeks after the execution of the power of attorney by Mrs. Sierra to I. A. Paschal, Enoch Jones and others commenced their second action in the District Court of Comal county, against John O. Meusebach, the trustee of the German Emigration Company, and others, to recover the land covered by the Bastrop concession; and now again the Bastrop and Veramendi titles are made to fight their battle in the courts. And if it be true, as asserted in the brief of appellees' counsel, that I. A. Paschal is one of the attorneys of record for Jones in this second suit, the fact is certainly remarkable that his power of attorney was but fourteen days old. Had he made demand upon the Mayor of New Braunfels, upon Dooley, the attorney of the company, and Fisher, the reputed agent, living at Austin, and yet within fourteen days' time counseled his client that the Bastrop title was good against the Veramendi title?

These are facts which we would not mention in any spirit

of criticism against a gentleman who has left behind him a name so honored by the profession and the community in which he lived; but the very eminent professional learning of Judge Paschal makes the fact important that he could not have regarded the conflict of title as settled at the time he received the power of attorney from Mrs. Sierra, and acted under it. Else, why did he almost contemporaneously bring a suit, the object of which was to set aside and destroy the Veramendi title altogether?

The second suit of Jones *et al.*, claiming under the Bastrop title, is commenced in 1854. And, on the 24th April, 1855, the appellants in this case, Sierra and wife, Dauchy, and Higginbotham, filed their plea of intervention in the case of Jones *et al. v.* Meusebach *et al.*, asking to defend the suit, and claiming title to themselves in the land. The venue in this case seems to have been twice changed. Although these intervenors subsequently withdrew their plea of intervention, the case was tried upon the Bastrop and Veramendi titles; the verdict and judgment were again for the defendants; an appeal was taken to the Supreme Court, and the judgment of the District Court, on the 24th of November, 1862, was re-affirmed. (See 26 Texas, 235.) Here, then, was a determination of the litigation growing out of the conflict between the Bastrop and Veramendi titles.

Let us, then, see what is the legal and equitable status of the parties at this time.

It is in proof that, at the spring term of the District Court of Guadalupe county, for the year 1855, Julius Eggeling, then Mayor of New Braunfels, made a tender to Wm. B. Leigh, one of the attorneys of Mrs. Sierra, of the full amount of the principal and interest due her from Prince Charles under the contract of March 14th, 1845. Again, in the spring of the same year, Eggeling made a tender to Mrs. Sierra herself. These tenders were refused.

On the 19th of December, 1862, less than thirty days after the determination of the last suit of Jones *v.* Meusebach,

H. Seele, then Mayor of New Braunfels, made the third tender to Messrs. Newton and Tunstall, attorneys of the appellants in this case. This was again refused. A fourth and fifth tenders were made and declined, and finally, on the 18th of November, 1869, the money, amounting to the sum of thirteen hundred and eighty-four dollars and twenty-five cents, was paid on tender to the appellants into the District Court of Guadalupe county, where it still remains.

It is scarcely material for us now to state further our opinion as to the time in which this contract was to be executed; we have stated that we regard it as the intention of the parties to the contract of March 14th, 1845, that the controversy between the Bastrop and Veramendi titles was to be finally settled, and thirty days given within which to execute the contract. Under our law, this controversy could not be legally settled without the second action of trespass to try title; and long before the determination of this second suit the balance of the purchase-money was tendered, and the facts show that the tender has been kept up until the present day.

A full examination of all the facts forces us to the conclusion that both the law and the equities in this case were fairly settled in the District Court. Prince Charles of Solms, acting in a benevolent and praiseworthy enterprise, undertook to pay, and did pay in advance, nearly one-half the purchase-money, at a time when the price fixed upon the lands was doubtless a fair valuation, and at the same time took upon himself the expense of litigating a doubtful title. He settled his friends and countrymen in good faith upon the lands he had just purchased, endeavoring, as far as possible, to meet the expectations with which they had left their far distant homes, and emigrated to this new and comparatively unsettled country.

They, with their characteristic industry and frugality, have toiled and endeavored, and have succeeded in beautifying and rendering comfortable their homes. A city has grown up; property has enhanced in value, and the country has greatly benefited by the incoming and good endeavors of these peo-

ple.  No court of equity, unless compelled by the stern prin-
ciples of law, and founding its action upon their manifest
default, would now sweep away, by one cruel decree, the
homes of these people ; but, in the opinion of this court, they
have never been in default, but have done all in their power
to make good in every particular the contract of their illus-
trious benefactor, one of the projectors of their colony, the
founder of their city.

The legal principles enunciated in this opinion are found
within the plainly beaten paths of the law.

The able counsel on both sides of the case have done them-
selves honor by the strength and ability of their arguments, and
the untiring industry with which they have prepared their briefs.

The judgment of the District Court is affirmed.

                                            Affirmed.