68 U.S. 745 (1863)
1 Wall. 745
UNITED STATES
v.
WORKMAN ET AL.
Supreme Court of United States.

*754 Messrs. Bates, A.G., and Wills, for the United States.
Messrs. Butterworth and Walker, contra.
*758 Mr. Justice CLIFFORD delivered the opinion of the court.
Appellees, in their petition to the commissioners, represented that Governor Pio Pico, on the eighth day of June, 1846, granted, sold, and conveyed in full property unto the first-named appellee and one Perfecto Huge Reid, the mission of San Gabriel, with all the appurtenances appertaining to the same, whether they consisted in lands, improvements, or cattle; and they also alleged that the juridical possession was duly given to the grantees of all that property, whether *759 buildings, vineyards, orchards, gardens, or land, and that the grantees remained in peaceable and quiet possession of the premises until they were forcibly cjected from the same under the orders of an officer of the United States. Representation also was, that the grantees at the time of the purchase were large creditors of the Mexican government, and that the sale was in all respects fair and genuine, and for the full value of the property. Other appellee claims title as grantee under the other original purchaser, and the record shows that a copy of that conveyance was filed with the petition.
I. Claimant introduced the grant described in his petition as the foundation of his claim, and it bears date as represented in the petition, and purports to have been signed by the governor as therein set forth and alleged. Recitals of the document show that the grantees solicited the grant for their own benefit and that of their families, and yet the record furnishes no trace of any such petition. None such was introduced, nor was there any attempt made at the hearing to account for its absence. Authority to grant the property of the missions, as specified in the instrument, is claimed to have been derived from the Departmental Assembly. Reasons assigned for the exercise of the power were, that it was necessary both for the payment of their indebtedness, and to prevent their total ruin, and as if those reasons were insufficient or unsatisfactory, it is added, "and to provide resources that may assist in the common defence in case of foreign invasion, which, according to self-evident data, is very near happening." Theory of claimant is, that the sale was a public sale, but there is no evidence of the fact; and the presumption, if any, from the recitals of the grant, is clearly the other way. Had the sale been a public one, then it would have been of no importance whether the purchasers were worthy or unworthy persons, provided they were the highest bidders and competent to take, and actually paid or secured the consideration. But the representation is, that they had "rendered valuable services to the government, and furnished eminent aid for the better protection and seenrity *760 of the department, under the guarantee of a just indemnification when the general treasury should be unembarrassed," and these representations are evidently put forth as considerations which influenced the granting power in acceding to the application of the grantees, and in making the grant for their own benefit and that of their families.
II. All that was necessary having been considered and examined, the recital in effect then is, that the governor, in the exercise of the powers with which he was invested, decided to execute a real sale and perpetual alienation of the mission in question to the original grantees, "with all the appurtenances recognized as thereunto belonging, consisting of lands, improvements, real estate, or self-moving property." Principal conditions were: 1. That the grantees should pay to the creditors of the mission the amounts presented against it, and properly proved within the period of two years. And 2. That they should thereafter and forever provide for the support of the father minister residing at the mission, and for the preservation of divine worship. Authenticity of the grant was proved before the commissioners by the testimony of one Nicholas A. Den, who testified that he was acquainted with the handwriting both of the governor and that of the secretary appearing on the document, and that the respective signatures were true and genuine. Evidence to show a compliance with the principal conditions is entirely wanting, or that the grantees ever went into the possession of the property under the grant. Grant bears date on the eighth day of June, 1846, but it is accompanied by a proclamation, signed by the governor, which, from its contents, though without date, must have been written at least a month later. Last-named document recites that the forces of the United States were then in the occupation of the towns of Monterey, Sonoma, San Francisco, and other frontier places north of the department, "where already waves the flag of the stars." Our forces took possession of Monterey on the seventh day of July, 1846, and the governor of the department well knew when that event occurred, for on that day the Mexican forces fled from that city, and never afterwards had possession *761 of the place. Commissioners confirmed the claim, and the United States appealed to the District Court.
III. Deposition of the secretary of the governor was then taken by the claimant, and the witness ultimately testified that there was a written document given to the original grantees in the form of a title, but he admitted that he could not recollect the date.
United States resisted the confirmation of the claim upon several grounds. First, they contended that the grant was antedated and fraudulent. Secondly, that the evidence introduced to establish its authenticity was incompetent and insufficient to justify a finding in favor of the claimants. Thirdly, that the governor had no authority under Mexican law to warrant him in making the grant, and consequently that the same was void.
District Court affirmed the decree of the commissioners, and the United States appealed to this court. Questions discussed here are substantially the same as those presented in the court below, but in the view taken of the case, it will only be necessary to examine the third proposition, as we are all of the opinion that the sale was made and the grant issued without any pretence of authority.
IV. Ample authority was conferred upon the Governor of California to grant vacant lands belonging to the Supreme Government. Such authority was derived from the colonization law of the eighteenth of August, 1824, and the regulations of the twenty-first of November, 1828, as has been affirmed by repeated decisions of this court. But all of those decisions proceed upon the ground that the authority conferred is limited and restricted to the granting of unoccupied public land. Grants under those laws were required to be made subject to the approval of the Departmental Assembly, and consequently unless such approval was obtained, the title was not regarded as perfect and complete. Public establishments of the department could not be granted under those laws, nor even lands which were in the lawful possession and occupancy of persons claiming provisional title under the government. Repeated decisions of this court have authorized *762 these conclusions, and in United States v. Vallejo, 1 Black, 541, it was expressly held that the Spanish system of disposing of public lands differed so widely from that provided for by the Mexican law of the eighteenth of August, 1824, and the regulations of the twenty-first of November, 1828, that the former system must be regarded as repealed, on account of the inconsistency and repugnancy of the latter system. Effect of that ruling is to regard all prior regulations upon the subject as inoperative, but the court went farther, and held that those laws were the only laws of the Mexican Congress passed on the subject of granting the public lands which were in force in that department, with the exception of those relating to the missions and towns, which will presently be considered. All pretence of authority, therefore, may be considered at an end, unless it can be found in the laws relating to the missions, or can be regarded as conferred by the Departmental Assembly, as is assumed in the grant. Appointment of the governor of a territory emanated from the Supreme Government, and all his powers were derived from the same source. Departmental Assembly consisted of seven members, who were elected from districts previously assigned by law. Many duties were devolved upon the governor, and also upon the Departmental Assembly, where each was required to act independently of the other. But other duties were prescribed, in the performance of which the governor and the Assembly were required to act in concurrence. In the latter class the governor could not act separately, though in some instances it was competent for the Assembly to act in his absence. United States v. Osio, 23 How., 285. Powers of the governor as such emanated from the same source as that from which he derived his commission, and there is no reason whatever to conclude that his authority over the public lands or public establishments of the department could be enlarged or diminished by the Departmental Assembly. 1 Arrillago Recop., pp. 202-210.
Supreme Government, on the seventeenth day of August, 1833, issued its decree secularizing the missions in California. *763 Intention of that decree was to make a radical change in regard to the temporalities of the missions, by taking their management and control from the priests, and vesting them in the civil authorities.
V. Congress of Mexico, on the third day of November, 1833, passed an act authorizing the executive to adopt all measures which should secure their colonization, and for that purpose gave authority to use the property donated to pious uses, in order to facilitate the operations of the commissions and the transportation of families. Mexican Government also published another decree of secularization, on the sixteenth day of April, 1834, which provided that the missions of the republic should be secularized; that they should be converted into curacies, the limits of which were to be designated by the governors of the territories in which the missions were situated. Assembly, on the ninth day of August, 1834, adopted certain provisional rules for secularizing the missions and converting them into pueblos; but those rules were made subject to the approval of the Supreme Government. Additional regulations were also promulgated by the governor, on the third of November, in the same year, upon the same subject; but on the seventh day of November of the following year, the Supreme Government issued a decree suspending the Secularization Act until the curates should take possession of their parishes, as had been provided by the second section of the act. Bishop of California, on the seventh day of November, 1840, addressed a petition to the Supreme Government, containing eight special requests, which in effect contemplated the suspension or repeal of the Act of Secularization. Corresponding decree of the President is dated on the same day, and directs that a general order be issued to the governor for the restoration, by means of the subaltern authorities, without delay or impediment, of the possessions and property used by them under their administration for the conversion of the heathen. Proof is entirely wanting to show that that order was ever annulled. On the contrary, the clear presumption is that it *764 remained in full force at the treaty of peace between the two countries.
VI. Constitution of 1824 did not define the powers of Departmental Assemblies or Territorial Deputations, as they were always called while that constitution remained in force. During the administration of Santa Anna, on the twelfth day of June, 1843, the Mexican Government adopted a new organic act, known as the "Bases Organica." Title seven defines the powers of the Departmental Assemblies, and the provision, among other things, contains the following, to wit: "To decree what is useful and conformable respecting the acquisition, alienation, and exchanges of the property that may belong to the community of the department. With regard to the alienation of lands, the existing laws shall be observed." Those bodies were vested, as will be seen, with the power of acquiring, alienating, and so changing the property belonging to the department; but it is not perceived that they could confer any power upon the governor even upon that subject, while in relation to the alienation of lands, that power was expressly restricted to what was conferred by the laws of colonization, which, as is now well known, was to approve or disapprove of a grant when regularly made by the governor under those laws.
VII. First decree of the Departmental Assembly, under Governor Pio Pico, upon the subject of the missions, is dated on the twenty-first day of April, 1845, and recites that the government will demand exact information as to their debts, and will suspend until a convenient time the granting of the lands immediately contiguous to the missions. Second decree bears date on the twenty-eighth day of May following, and provides for calling together the Indians of certain missions therein named, by means of a proclamation; and also, if they fail to reunite within one month from the day of the publication of the proclamation, that they should be considered as notified that the missions would be declared vacant, and be disposed of as might best suit the general good of the department. Decree of the twenty-eighth of October, 1845, authorized the sale to the highest bidder of *765 certain missions therein named, which, however, did not include the one in question. Provision was also made in the same decree for renting the other missions, under certain stringent regulations. Third decree was passed on the thirtieth of March, 1846, and purports to authorize the Departmental Government in carrying into effect the object specified in the second decree, so far as respects the missions of San Gabriel, San Luis Rey, San Diego, and any others in similar circumstances, to act in such a manner as may appear most conducive to prevent their total ruin. Reference is doubtless made in the grant to this last-named decree, as the foundation of the authority for making the sale. Information, however, had reached the Supreme Government long before any such pretended authority was exercised, that the governor of the department was devising measures for the sale of these properties. Effective measures were immediately taken to prevent any such abuse of the powers committed to his charge. Those measures consisted in the order of the President suspending all proceedings respecting the alienation of the property till the determination of the Supreme Government, and was accompanied by directions given to the Departmental Government to make a report of all the particulars.
Evidence that these preventive measures were taken, consists of a despatch from the Minister of Industry and Public Instruction, addressed directly to the governor, in which those facts are very formally and fully stated.
VIII. Even suppose such a power had been conferred upon the governor by the Supreme Government, still it was clearly competent to withdraw the power and forbid its exercise; but the truth is, the governor never had any such power. Despatch of the Minister of Industry and Public Instruction was not issued to recall a power previously conferred, but to prevent the attempt to exercise a power never possessed.
Reference is also made to the despatch of the Minister of War, of the tenth of March, 1846, and also to the proclamation of the President, of the thirteenth of March, in the same year, as conferring such an authority; but it is so obvious *766 that neither of the documents will bear any such construction that we do not think it necessary to enter into any argument upon the subject, and only advert to it that it may not appear to have been overlooked.
The decree of the District Court is therefore reversed, and the cause remanded, with directions to
DISMISS THE PETITION.

NOTE.
At the same time with the preceding case, and argued with it on one brief, another case, relating to a different mission, that of San Luis Rey, in the County of San Diego, but so far as respects the law governed by the same principles, was decided. It was thus: