489 So.2d 255 (1986)
STATE of Louisiana
v.
Kirby SMITH.
No. 85-KA-595.
Court of Appeal of Louisiana, Fifth Circuit.
February 13, 1986.
On Rehearing May 12, 1986.
*256 John M. Mamoulides, Dist. Atty., Eric Honig, Dorothy A. Pendergast, Asst. Dist. Attys. (Louise Korns, of counsel), Gretna, for plaintiff-appellee.
Ralph L. Barnett, Gretna, for defendant-appellant.
Before BOUTALL, CHEHARDY and KLIEBERT, JJ.
KLIEBERT, Judge.
The defendant Kirby B. Smith was charged by bill of information with violation of LSA-R.S. 14:89.1, to-wit: aggravated crime against nature. On February 27, 1985, the defendant was arraigned and through retained counsel entered a plea of not guilty. On March 21, 1985 the state filed into the record the notice of its intent to introduce proof of similar acts to show guilt, knowledge, system and intent under LSA-R.S. 15:445, et seq. Trial began before a twelve member jury on March 26, 1985. The jury returned a verdict of guilty as charged on March 29, 1985.
Following the receipt of a pre-sentence investigative report, previously ordered by the court, the defendant was sentenced to nine years at hard labor without benefit of probation, parole or suspension of sentence. It is from that conviction and sentence that defendant appeals. We reverse the conviction.
On appeal defendant designates eight assignments of error. The first three assignments *257 of error, Nos. 1, 2 and 3, evolve around the sufficiency of the Prieur notice which the state gave the accused prior to the trial of the present case. The next two assignments of error, Nos. 4 and 5, are relative to the admission of a private conversation between the defendant and his estranged wife over the defendant's objections. Assignments of error Nos. 7 and 8 are concerned with the excessiveness of the sentence.
The facts relative to the offense charged are as follows: Detective Mark Murret of the Kenner Police Department, the arresting officer, testified that his office had received an anonymous call concerning the abuse of a white, female juvenile, about ten years of age, named Lacey. The caller gave the victim's address as 3627 Ole Miss Avenue in Kenner. Officer Murret attempted to locate someone at the address but was unsuccessful.
Thereafter, by contacting the grammar schools in the area, he learned the name of the alleged victim was Lacey Williams and, by phoning the emergency phone number given to the school, learned the address in Kenner given by the anonymous caller was that of Mrs. Zemo, the victim's grandmother.
Mrs. Zemo gave the officer the name, address and phone number of Robbie Smith, the victim's mother, with whom he made arrangements for the interview of the victim. Based upon information obtained through the interview, Detective Murret obtained an arrest warrant based on a violation of LSA-R.S. 14:81, i.e., indecent behavior with a juvenile. Subsequently, the R.S. 14:81 charge was dismissed and a charge for violation of R.S. 14:89.1, i.e., aggravated crime against nature, was instituted.
The defendant, who was 37 years of age at the time of the alleged offense, was a high school graduate and had been honorably discharged from the U.S. Army after serving two years in Vietnam. He had previously been married and two of the children of that marriage, Timmy Smith, age 12, and Kevin Smith, age 14, had resided with him since birth. The defendant and his present wife, Robbie Smith, were married in 1980.
The defendant, his wife, the two children of his previous marriage, the victim, a seven year old child (at the time of the alleged offense) of the wife's previous marriage, and Joshua, a child of the marriage between the defendant and his present wife, lived as one household in Kenner. The two boys slept in one bedroom, the victim had a separate bedroom, and the defendant and his wife had a separate bedroom which was sometimes shared with the youngest child.
The testimony of the mother and the child reveals that the victim had a history of bed-wetting. When a bed-wetting incident occurred or the child became frightened during the night, according to them, the child would go to the bedroom where the defendant and his wife slept. The victim testified that she laid between the defendant and his wife when she slept in their room, sometimes along with the youngest child. The mother testified that the victim and the child sometimes slept between her and the defendant. The defendant testified the victim sometimes slept in the room on the floor; however, he categorically denied the child ever slept in the bed with him.
The victim testified that on the night of the alleged offense she entered the bedroom and found the youngest child sleeping next to her mother. She then laid down in the bed between the defendant and her mother, when the following, as told by the victim at page 11 of the transcript, transpired:
"A. And so myand Joshua slept by my Momma and I had to sleep in the middle and Kirby put his hand in my private spot.
Q. Okay. Was the jury able to hear that? What were you wearing when he did that?
A. I was wearing my nightgown.
Q. Okay. And where did he touch you?
A. In my private spot.

*258 Q. Okay. Do you know how many times that happened?
A. I don't know but the last time, he did something different.
Q. Okay, whatdid he do that was different that last time?
A. He stuck his private spot in my mouth.
Q. Okay. And did anything happen when he did that?
A. Something came out.
Q. Okay, and where did it go?
A. And I got up and I spit it in the sinkin my Momma's sink."
The child testified that she did not tell anyone of the incident because she feared her mother would spank her. However, she eventually told her maternal grandmother of the incident.
The husband was called as a witness in his own defense. He testified on direct examination that he had never put his penis in the victim's mouth and that he had never molested, touched, or abused the child. Then, while on cross-examination by the prosecutor, the following answers were given to questions asked by the prosecutor:
"Q. Now when the police interviewed you as far as whether or not you had done what Lacey said that you did to her, you told them that you didn't do it.
A. I told them that I didn't have no way that I did such a thing.
Q. And you've never admitted that doing to anybody.
A. I have never admitted that doing to anybody at all.
Q. And you never admitted it to your wife, Robbie, did you?
A. No sir, I never admitted it to her.
Q. Isn't it true that you told your wife
. . .
MR. BARNETT:
Wait, wait, if your Honor please, I'd like to excuse the jury."
Following a lengthy discussion, outside the presence of the jury, defense counsel argued that the evidence was not admissible because he was not given notice of the state's intention to introduce the defendant's confession as inculpatory statements as required by La.C.Cr.P. Article 768 and, additionally, the statements defendant was being interrogated about were inadmissible as a privileged spousal communication. The prosecutor contends the notice required by La.C.Cr.P. Art. 768 only applies to statements made to police officers and not family members and that the wife could waive the spousal privilege, hence, she could later be called to rebut the defendant's testimony. During the discourse the trial court indicated his belief the wife could waive the spousal privilege.
Then, at the trial court's suggestion, the prosecutor, out of the presence of the jury, completed the intended question to the defendant as: "Isn't it true that after you were legally separated from your wife, that you admitted to her that you did in fact do what Lacey had claimed ... and that ... if your wife would consider taking you back... you would seek help for it ... a psychiatrist..." (Vol. I, Tr. p. 92). After the defendant responded in the negative, the prosecutor agreed to withdraw the question, but announced an intention to "save it for rebuttal evidence."
The jury then returned to the courtroom and the following question was asked by the prosecutor:
PROSECUTOR:
"And you never admitted to anyone that you did what Lacey claimed you did?"
DEFENDANT:
"No sir, I never have."
On re-direct examination of the defendant by his own attorney, the defendant testified:
"MR. BARNETT:
Q. Kirby, did you at any time ever beg your wife to come back and that you would seek help and that you admitted this to her?
A. No sir, I had never begged her to come back. As far as seeking help, I have went to a psychiatrist of my own free will and have went to the Family *259 Services with my other two boys and theyI have also brought my other two boys to a psychiatrist just to find out what was going on. I was trying to work with them.
Q. Did you admit to your wife that you were doing this because you did this to Lacey?
A. No sir, I sure deny it.
* * * * * *
Q. Did your wife at any time prior to the time that she left, ever discuss with you anything that Lacey may have told you and your abusing Lacey in any way?
A. No sir.
Q. Did she ever before she left around April the 2nd, did she ever tell you that she suspected you of doing anything to this child?
A. No sir."
Subsequently the wife was called by the prosecution to testify as a rebuttal witness. Following her testimony waiving the marital privilege, defense counsel informed the court the defendant was not waiving the marital privilege and again objected to her being permitted to testify. For the record the prosecutor stated the wife was being called to rebut the defendant's statement on redirect examination (above quoted) denying admitting his guilt to his wife. While reiterating his belief the wife alone could waive the marital privilege, the trial judge allowed the wife to testify.
She responded to the prosecutor's questions as follows:
"Q. Okay. Did your husband talk with you about those charges at any time?
A. Yes, he has.
Q. What did he tell you?
A. He admitted to playing with my daughter.
Q. What did he admit to?
A. That he molested Lacey.
Q. Did he ...
A. He touched her and, you know, he put his hands down there ...
Q. Did he admit to anything else?
A. He admitted to shooting in her mouth once.
Q. What do you mean by `Shooting in her mouth'?
A. I mean, he shot offstuff came out of him and went into Lacey's mouth.
Q. Okay. Out of what part of him?
A. Out of his penis.
THE COURT:
Ma'am?
THE WITNESS:
Out of his penis.
THE COURT:
All right."
On cross-examination the wife admitted that prior to the incident for which the defendant was being tried, she was unhappy with her relationship with the defendant, as follows:
"A. I told them I was unhappy and that I wanted to leave but I couldn't leave because of the boys and Lacey, but that we were going to try to work it out. I was trying and then that's when I found out that he did that to Lacey and I left.
Q. And you had made mention that you were unhappy approximately a year, a year and a half before that and you wanted to leave?
A. A year, but I also tried to let our marriage make go, until I found out."
Since the conclusion reached by us on the defendant's assignments of error Nos. 4 and 5 renders the other assignments of error moot, we consider those assignments of error first.
In assignments of error Nos. 4 and 5, defendant contends the trial court committed reversible error in admitting into evidence the testimony of his wife concerning his alleged admission to her that he had committed the acts for which he was being tried. The basis for his contention is twofold: (1) the state failed to give him notice of the state's intent to use inculpatory statements at trial as required by LSA-C. Cr.P. Article 768, and (2) the admission of these statements violated his privilege *260 against having private conversations with one's spouse introduced in evidence against him. The state, on the other hand, argues that Article 768 applies only to statements made to law enforcement officials and the defendant's counsel "opened the door" to the admission of the statements by questioning the defendant relative to the statements after the state had withdrawn the objected-to questions by the prosecutor. Alternatively, the state urges "harmless error".
LSA-C.Cr.P. Article 768 provides:
"Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."
We first note that no pre-trial discovery was conducted; hence, the defendant had no way of ascertaining whether or not the state intended to use any statements. The purpose of this article is to prevent surprise and to allow the defendant to prepare an adequate defense in light of the damaging statements introduced at trial. State v. Parker, 436 So.2d 495 (La. 1983); State v. Russell, 416 So.2d 1283 (La.1982).
Contrary to the state's contention, however, the notice requirement is not limited to statements made to police officers. In State v. Jackson, 450 So.2d 621 (La. 1984), the supreme court ruled the article was applicable to statements made to traveling companions; in State v. Knapper, 458 So.2d 1284 (La.1984), to statements made to co-perpetrators of crimes, and in State v. Perry, 408 So.2d 1358 (La.1982), to statements made to the mother of a juvenile victim.
An inculpatory statement is an out-of-court admission of incriminating facts made by the defendant after the crime has been committed. State v. Quimby, 419 So.2d 951 (La.1982); State v. Seymour, 449 So.2d 1189 (La.App. 2nd Cir. 1984), writs denied 452 So.2d 173 (La.1984). The statement in the instant case directly incriminated the defendant and corroborated the state's version of the facts. Clearly, the statements were inculpatory within the meaning of Article 768. Hence, the state's failure to give the required notice rendered the statements inadmissible. State v. Jackson, supra; State v. Billiot, 421 So.2d 864 (La.1982); State v. Perry, supra.
Moreover, in assignment of error No. 5 the defendant contends that the statements made to his wife violated the spousal privilege.
LSA-R.S. 15:461 provides:

"Competent witness defined; those not compelled to testify
The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but;
(1) Private conversations between husband and wife shall be privileged.
(2) Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other.
(3) In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes or offenses, a person so charged shall, at his own request, but not otherwise, be deemed a competent witness."
The supreme court discussed the dual nature of this privilege in State v. Bennett, 357 So.2d 1136 (La.1978) as follows:
"This statute, in effect, creates two distinct privileges. The first of these is the privilege which attaches to private conversations between husband and wife and which may be asserted by the defendant-spouse. Secondly, the statute establishes a privilege in favor of a spouse called to testify against the other spouse by providing that neither spouse shall be compelled to be a witness against the other in a criminal proceeding. *261 The exercise of this privilege rests with the testifying spouse alone and may not be invoked by the defendant-spouse. The statute, however, does not prohibit a spouse from waiving this privilege and voluntarily taking the stand against the other spouse to testify to nonprivileged evidence. State v. Triplett, 313 So.2d 227 (La.1975).
[5, 6] In the instant case, although defendant's wife possessed a privilege not to testify against her husband, she expressly waived this privilege and voluntarily took the stand against defendant on behalf of the state. By waiving her privilege, the witness became competent to testify against her husband at trial as to nonprivileged evidence. Defendant could not prevent his wife from so testifying by asserting his privilege as to private conversations between the spouses since that privilege could be urged only to prevent his wife from disclosing during the course of her testimony private conversations between them. Hence, because defendant's wife was competent to testify against him at trial, the state was properly permitted to call her as a witness against defendant."
Under the supreme court ruling, it is apparent the wife could waive her privilege and testify against her spouse. However, only the defendant could waive his privilege against having private conversations with his spouse introduced against him. It is presumed the conversations with one's spouse are private. State v. Narcisse, 426 So.2d 118 (La.1983); State v. Dupuy, 319 So.2d 294 (La.1975). There is no evidence in the record which indicates that these conversations were not private.
Privileges are statutory creations and should be given genuine construction. They are created by the legislature and any changes or exceptions to them are best left to the legislature. State v. Fuller, 454 So.2d 119 (La.1984); State ex rel. Sullivan v. Maggio, 432 So.2d 854 (La.1983).
We have no alternative under the law but to conclude that those conversations between the husband and wife were private, privileged conversations and, in the absence of a waiver by the defendant were not admissible evidence against him.
The prosecutor's original questions to the defendant seeking an admission or denial of the privileged statements, coupled with the trial judge's erroneous ruling on the waiving of privileged communications, placed defense counsel in the proverbial "box". Since the defendant has no right to rebut the state's rebuttal evidence, unless he elicited from the defendant a denial of the statements while the defendant was on the stand, under the court's ruling, the jury would hear only the wife's version of the statements without a denial by the defendant. Under those circumstances, he chose to elicit the denial. We cannot say this constituted a waiver of the privilege.
Having concluded that the evidence was not admissible as a matter of law, we must next determine if its admission into evidence was harmless error.
In State v. Gibson, 391 So.2d 421 (La. 1980) the Louisiana Supreme Court adopted the standard of review of harmless error adopted by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 705 (1967). The court stated:
"Additionally, we think that the Chapman rule provides a helpful supplemental guide in cases involving only errors of state procedure or state law. Our state constitution and statutory harmless error rule admonish a reviewing court generally to shun factual questions and to reverse only when substantial rights of the accused have been affected. In some of our recent decisions we may have come perilously close to violating both rules because of their lack of specific content.3 It appears that the Chapman test, i.e., `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and that `the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt,' will assist this *262 Court to fulfill both of the requirements of state law." (Footnote omitted)
This approach has been followed in State v. Banks, 439 So.2d 407 (La.1983); State v. Porretto, 468 So.2d 1142 (La.1985); State v. Rankin, 465 So.2d 679 (La.1985).
The state's case to prove the commission of the crime consisted of (1) the victim's testimony, (2) the alleged statement of admission to the wife, (3) the testimony of the child's maternal grandmother, and (4) the testimony of the arresting officer.
The testimony of the grandmother and the arresting officer shed no direct evidence of a crime. They merely stated how they reacted after having had a conversation with the child. Excluding the privileged testimony of the wife, the only remaining evidence is the testimony of the victim. Thus, excluding the privileged statements, the evidence would have been a one on one confrontation between the defendant's denial and the victim's accusation. With the privileged statements, notwithstanding the defendant's present denial, the jury heard the wife's testimony that the defendant admitted his guilt to her. Although the defendant may well have been convicted without the privileged statements, under the circumstances here we can only conclude there is more than a reasonable possibility the erroneously admitted evidence contributed to the defendant's conviction and, hence, we cannot say beyond a reasonable doubt that the error was harmless.
Accordingly, the defendant's conviction and sentence are set aside and the case remanded to the trial court for further proceedings.
REVERSED, SET ASIDE AND REMANDED.

ON REHEARING
Our original opinion reversing the defendant's conviction was handed down on February 13, 1986. On the application of the State, we granted a rehearing which was heard on April 8, 1986.
The original opinion reversed the conviction and sentence for two reasons: (1) the State's failure to give defendant notice of the State's intent to use inculpatory statements at trial as required by LSA-C.Cr.P. Article 768 and (2) the admission of the statements violated defendant's privilege against private conversations with his spouse being introduced in evidence against him, as provided for by LSA-R.S. 15:461. The State's application for a rehearing pointed out for the first time the provisions of LSA-R.S. 14:403 F. In brief and in oral arguments on the rehearing the State argued that under the provisions of LSA-R.S. 14:403 F the defendant's private communications to [private conversations with] his wife were admissible. For that reason, we granted a rehearing and have carefully reconsidered the entire record and our original opinion. Notwithstanding the possible application of the exception to the spousal privilege, created for child abuse and neglect cases by LSA-R.S. 14:403 F, for the reasons hereinafter stated, we adhere to our original opinion reversing the conviction.
On the rehearing the State contends our opinion on original hearing reversing the conviction is contrary to the law and evidence for the following reasons: (1) the State did not have knowledge prior to trial of the inculpatory statement and was therefore precluded from giving notice as required by LSA-C.Cr.P. art. 768; and (2) the spousal privilege for private conversations between husband and wife is not grounds for excluding the inculpatory statement since LSA-R.S. 14:403 F creates an exception to the privilege.
The State cites the following excerpt from cross-examination of defendant's wife in support of its argument that the prosecutor did not learn of the existence of the statement until trial:
"A. I haven't even told him [the prosecutor] all this ... He knew nothing... I told him just when I got through telling you ... The D.A. knew nothing, that Kirby pushed *263 me on the side of the road and talked to me."
However, our review shows this position is directly contradicted by the record as the prosecutor informed the court he intended to question the defendant about specific details of the statements before the wife was called as a witness. (Vol. 1, Tr. p. 92). It is clear from the contents of the prosecutor's questions to the defendant that he knew the exact nature of the statement at the time he cross-examined the defendant before the defendant's wife testified. (see Vol. 1, Tr. p. 86, quoted in our original opinion immediately following the child's testimony of the event.) Thus, it is apparent the prosecutor learned of the existence of the statements at some point prior to the defendant's testimony, which was given on the third day of the four-day trial. Whether he learned of the statements from the defendant's wife or another source is not indicated by the record and is of no moment now.
The State cites State v. Breaux, 473 So.2d 923 (3rd Cir.1985) in support of the proposition that Article 768 is not applicable when the prosecutor does not learn of the existence of an inculpatory statement until after his opening statement. However, the Breaux court at page 924 noted:
"Arguably, if the statement was made by defendant after the State's opening argument, the notice requirement of Art. 768 should not apply since it would require the State to do the impossible."
(Emphasis Supplied)
In the present case the wife contends the statement was made in advance of trial. The prosecutor should have informed defense counsel of his intent to introduce the statement the moment he learned of its existence. By waiting until cross-examination of the defendant the prosecutor deprived defense counsel of the opportunity to make critical strategy decisions such as whether to place the defendant on the witness stand.
The State argues open file discovery was granted and therefore Article 768 is not applicable. In our original opinion we noted no pre-trial discovery was conducted. Even were we to assume open file discovery did take place, we must still reach the same conclusion, for the State did not fulfill discovery obligations. If the prosecutor did not learn of the existence of the statements until trial, then it is apparent information concerning the statements could not have been in his file at the time discovery was made. Pursuant to C.Cr.P. article 729.3, the prosecutor was under a continuing duty to disclose the existence of the statements as soon as they were discovered. Under identical circumstances in State v. Mitchell, 412 So.2d 1042 (La.1982), the court found that the State's failure to provide defense counsel with a copy of an inculpatory letter until cross-examination of the defendant impaired a substantial right, that is, the right to prepare a defense, and therefore constituted reversible error. See State v. Sneed, 316 So.2d 372 (La.1975); State v. Manning, 376 So.2d 95 (La.1979) and State v. Whittaker, 449 So.2d 611 (1st Cir.1984).
LSA-R.S. 14:403 F provides as follows:
"Any privilege between husband and wife, or between any professional person and his client, such as physicians, and ministers, with the exception of the attorney and his client, shall not be grounds for excluding evidence at any proceeding regarding the abuse or neglect of the child or the cause thereof."
LSA-R.S. 14:403, commonly known as the child abuse reporting law, was enacted in an effort to protect neglected and abused children by mandating that suspected cases be reported and by providing procedures whereby the protective services of the State could be immediately implemented to remove children from a harmful environment. In furtherance of this goal, Section F of 14:403 provides for the exclusion from privilege of evidence regarding injury to a child.
The State contends that LSA-R.S. 14:403 F represents a legislative intent to establish a general exception to the private marital conversations privilege established by LSA-R.S. 15:461(1) and therefore the inculpatory *264 statements were admissible. Despite the fact that R.S. 14:403 F in its present form has been in existence since 1974, its application has yet to be extended to criminal prosecutions such as the present one. In State v. Adams, 394 So.2d 1204 (La.1981), the Supreme Court, in addressing the issue of whether the defendant's wife should have been allowed to testify as to private marital conversations at his trial for the aggravated rape of defendant's five-year-old-stepdaughter, acknowledged the error [the admission of private conversation between husband and wife] on the part of the trial judge but discerned no prejudice. The Adams court did not discuss the applicability or inapplicability of R.S. 14:403 F. Whether it was rejected as inapplicable or merely overlooked because the prosecutor did not urge the exception is a matter of conjecture.
Nevertheless, we find it unnecessary to determine whether R.S. 14:403 F is applicable in the instant case.[1] Even had the exception to the privilege applied, the statements were nonetheless inculpatory in nature. As pointed out in our original opinion and here, the State's failure to notify defense counsel of the existence of the statements and the State's intent to introduce them, under the narrow circumstances of the case, deprived defense counsel of the opportunity to plan and execute an effective defense, thereby impairing a substantial right of the defendant and thwarting the very purpose of the article and the privilege, i.e., a fair trial.
For the foregoing reasons, we reaffirm our original opinion reversing the defendant's conviction and remand the case to the trial court for further proceeding.
REVERSED AND REMANDED.
NOTES
[1] Finding the applicability of the provision to a case like the one present here would necessarily require an analysis into whether the legislature, in enacting the provision, intended to supersede the long established spousal privilege designed to safeguard society's prime unitthe family in order to enhance criminal convictions of child offenders, or merely to enhance or expedite the removal of a child from a family unit in custody or abandonment proceedings where the child's best interest mandates its removal from the family unit or environment in which the child is being abused or neglected.